**Jan S. RIMEDIO, Plaintiff,**

v.

**REVLON, INC., Defendant.**

**No. C–1–80–431.**

United States District Court,
S. D. Ohio, W. D.

Jan. 13, 1982.

Rodger N. Walk, Cincinnati, Ohio, for plaintiff.

J. Mack Swigert, Cincinnati, Ohio, Wm. H. Brown, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

SPIEGEL, District Judge.

This case came before the Court on a charge of sex discrimination in violation of

Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.* Plaintiff was employed by the defendant corporation for almost six years. For four years she held the position of Account Manager.

Plaintiff charges that she was discriminated against, because of her sex, in the terms and conditions of her employment and that she was constructively discharged from her position at Revlon, Inc. (Revlon) on account of her sex.

There was a trial to the Court which lasted for five days. Plaintiff was on the witness stand for most of one full day on direct examination and for more than one day on cross-examination. Plaintiff was an extremely credible and impressive witness. Her testimony was very consistent under a difficult cross-examination and she was credible at all times in relating the events that led up to her resignation from Revlon. Having observed the plaintiff's powers of observation and her ability to remember and accurately narrate the events that occurred in 1976 and 1977, as well as her general credibility, in situations where there was a conflict in the testimony, we often found the testimony of the plaintiff to be more believable than the testimony of the witnesses for the defendant. Because much of the testimony was conflicting, our findings with regard to the credibility of the witnesses is an important element of our decision.

Plaintiff charges that her most recent supervisor at Revlon, Mr. William Vick, harassed her, threatened her with loss of her job, prevented her from exercising the authority and responsibility commensurate with her position and generally treated her without respect. Plaintiff alleges discriminatory disparate treatment in that similarly situated male Account Managers were not treated in this manner.

Plaintiff presented testimony from two other women who had worked as Account Managers under the supervision of Vick. Both felt that they, too, had been discriminated against because of their sex, and both of these women resigned their employment with Revlon because of Vick's treatment of them. Plaintiff also offered testimony from two men who worked as Account Managers under Vick's supervision. Neither of these men had experienced the same type of treatment that the women received and neither felt harassed or discriminated against in any way.

Vick applied different standards to the same job and function of Account Manager for men and for women. He gave the men more responsibility with regard to decision making and allowed them to fully manage their own accounts. The women, on the other hand, were not given as much responsibility and Vick made the important decisions on their accounts, sometimes unilaterally. The women were not listened to or treated with the same professional respect as the men. Vick required more of the women in terms of reports and detail work than he expected of the men and constantly threatened the women with loss of their job if they could not comply with his demands.

Discrimination is difficult to prove because there is always the excuse that the plaintiff was treated differently because of job performance rather than because of a prohibited factor. We believe, however, that the evidence in this case conclusively proves that the plaintiff was discriminated against because of her sex.

In some instances the discrimination practiced by Vick was subtle; in other instances, it was not. What emerged from all of the testimony and evidence was a pattern of intentionally treating the women under his supervision differently than he treated similarly situated men with regard to the terms and conditions of their employment. We find that Vick intentionally treated the women in this manner and that plaintiff's resignation was not voluntary, but was brought about by the stress and anxiety imposed upon her by Vick which made the working conditions intolerable for her; as such, it constituted a constructive discharge.

Our Findings of Fact and Conclusions of Law follow:

## FINDINGS OF FACT

1) Plaintiff, Jan S. Rimedio, is a female citizen of the United States and is a resident of Fairfield, Ohio, which is located within this judicial district.

2) The defendant, Revlon, Inc., is a corporation which maintains its principal headquarters in New York City, New York, and at all times material hereto, conducted business in the State of Ohio and within the Western Division of the Southern District by maintaining a Regional Manager within this District.

3) The defendant at all times material hereto has and does now employ more than 15 persons and has continuously been, and is now an employer engaged in an industry affecting interstate commerce.

4) Within 180 days of the occurrence of the acts of which plaintiff complains, she filed charges of employment discrimination with the Equal Employment Opportunities Commission (EEOC) on or about March 22, 1978, and with the Ohio Civil Rights Commission on March 23, 1978.

5) On or about May 12, 1980, plaintiff received a "Notice of Right to Sue" from the Cincinnati District Office of the EEOC, entitling her to institute this lawsuit.

6) Plaintiff began her work with Revlon on March 6, 1972, as a Consultant Trainee based in Miami Lakes, Florida. On September 1, 1972, her base location was changed to Reston, Virginia where her title was that of a Consultant. On February 1, 1973, plaintiff's base location was changed to Atlanta, Georgia. On January 1, 1974, plaintiff was transferred to Cincinnati and was promoted to the position of Account Manager for Revlon's East Central Region.

7) Plaintiff involuntarily resigned her position on December 31, 1977.

8) When plaintiff first came to Cincinnati, she worked under the supervision of Jack Ireland who was Revlon's Regional Director for the East Central Division.

9) Joseph Casey Ryan replaced Jack Ireland as Regional Director in July of 1974. In January 1975, Ryan evaluated plaintiff's current performance and rated her as a six on a scale of one to nine. He forecast her maximum future performance as a seven. He noted on the Appraisal Form that plaintiff had inherited a severe overstock condition in most of her accounts and that she had done an outstanding job overcoming these problems. He noted that plaintiff's orders per day and promotional coverage were among the best in the Region. Ryan recommended a salary increase for plaintiff at this time. Ryan evaluated plaintiff's 1975 performance in January 1976. Although the Appraisal Form does not indicate the rating plaintiff received at this time, she testified during trial that she was again rated as a six. Six is at the high end of the scale indicating average performance. A rating of seven is above average. Plaintiff's 1975 evaluation indicated a 9% increase in sales over the previous year as compared with an average regional increase of 7%. Ryan again recommended a salary increase for plaintiff.

10) In July 1976, plaintiff received a desk clock from Revlon as an Outstanding Achievement Award for sales and account management for the year 1975–76.

11) Plaintiff had no problems working with Jack Ireland or Casey Ryan. She was treated fairly and with respect by both of these men.

12) William Vick replaced James Casey Ryan as Regional Director and plaintiff's supervisor in July of 1976. Vick remained as plaintiff's supervisor until her resignation in December of 1977. Plaintiff had no real problems getting along with Vick for the first three or four months, but sensed that his attitude towards women was different than his attitude towards men.

13) In January 1977, Vick evaluated plaintiff's performance as a six on a scale of one to nine. He evaluated plaintiff's maximum future performance as a seven. He noted that plaintiff had a 5.35% increase in sales over the previous year as compared to a 5.85% average increase for the region. Vick recommended that plaintiff receive a salary increase.

14) Vick treated the male Account Managers differently than the female Account Managers and applied different standards to the job and functions of Account Manager for women and for men.

15) Vick got along well with women Account Managers who accepted his control over their accounts, but did not get along well with the female Account Managers who insisted that they be accorded the same degree of authority and responsibility enjoyed by the male Account Managers.

16) Vick would not negotiate with the female Account Managers in general, and the plaintiff in particular, with regard to the sales goals established for their accounts. Rather, Vick set the goals that plaintiff was required to obtain and then refused to modify them when plaintiff protested they were too high and impossible to meet. All of the women noted that Vick arbitrarily set the goals for their accounts and that they were not involved in the decision-making process of establishing the sales goals.

17) On the other hand, Vick did negotiate sales goals with the male Account Managers. Account Managers James Anderson and Bruce Ikenberry met with Vick a number of times to formulate the goals for the coming year. They would sit down and analyze the facts and figures and negotiate until reasonable goals were established.

18) At times, Vick unilaterally altered the sales goals already established for the female Account Managers, but did not unilaterally alter the sales goals of male Account Managers.

19) Vick was highly critical of plaintiff's performance, but offered her little in the way of constructive assistance when she requested it. Vick was also highly critical of the performance of the other women who testified. They never knew what they could do to please him, and he never offered constructive criticism. Yet, both of the men testified that Vick was very helpful and always willing to work with them when they had a problem.

20) On occasion, Vick approached plaintiff's accounts without her being present to discuss sales performance or display set-ups. There was no evidence that Vick tried to locate the plaintiff so that she could accompany him.

21) James Anderson testified that while Vick had the authority to contact the accounts without the Account Manager present, it was not proper procedure because it diminished the credibility of the Account Manager in the eyes of the client. According to Anderson, Vick would approach his accounts without Anderson being present only if there was a critical problem that needed immediate attention and Anderson was not available for some reason.

22) Vick required weekly reports from all Account Managers. The reports were first phoned to Vick on Thursday evenings and then were to be mailed and received by him no later than Saturday morning.

23) Vick claimed that often he did not receive plaintiff's written reports by Saturday morning despite her efforts to get the reports to him on time.

24) According to plaintiff and her husband, plaintiff always had her reports prepared by Thursday night and she would drive them to a special mailbox with a late pick-up so that Vick would receive them by Saturday morning. She had no explanation for why he was not receiving the reports on time except that there was a possible problem with the mail system, over which she had no control. Moreover, all of the information contained in the written report was orally reported to Bill Vick by Thursday evening; there was no testimony that plaintiff ever failed to phone the information to Bill Vick on Thursday evening.

Despite the fact that Vick received the information by telephone, he required the plaintiff to drive a copy of the report to his home if he did not receive it in the mail by Saturday morning. He also threatened plaintiff with loss of her job if she did not get the written report to him on Saturday.

25) The other female Account Managers who testified also were required to drive

the weekly report to Vick if he did not receive it in Saturday's mail, and they were also threatened with loss of their jobs if they failed to do so. At times, Barbara DiRosario was required to drive her report from Columbus to Cincinnati.

However, Vick allowed the male Account Managers to phone their weekly reports to him and did not require the men to drive their reports to his house if they were late arriving in the mail.

26) Vick stressed the importance of the weekly reports to all the Account Managers but never threatened either of the men who testified with loss of their jobs if their reports were not received on time.

27) Although Vick would not accept the explanations of the female Account Managers when their reports were late arriving in the mail, he did accept the explanations of the male Account Managers who testified when their reports were late arriving in the mail, and Vick admitted that when James Anderson went fishing and his report was late, there was no problem because he obtained the information over the phone. In the case of the plaintiff, however, he always made her drive the report to him no matter what the reason if it was not received in the mail by Saturday morning.

28) Vick called plaintiff as early as 6:00 in the morning, even though both plaintiff and her husband requested that he not call before 7:00 A.M.

Vick did not call anyone else before 7:00 in the morning.

29) Vick did not pay any attention to the ideas or suggestions put forth by female Account Managers. Anderson testified that Vick always listened to him, but did not seem to listen to the women. Plaintiff testified that Vick never seemed interested in any of her ideas or recommendations. We conclude from this testimony that Vick did not treat the female Account Managers with the same professional respect or courtesy with which he treated the men and that this was apparent to other men in the Region, as well as to the women.

Additionally, the female Account Managers under Vick often were left out of the group activities at the regional meetings, whereas, in the past, the Regional Directors had always planned activities to include all the Account Managers from the region.

30) Vick sent numerous memoranda to the Account Managers in his region, but the memoranda sent to plaintiff often did not accurately reflect the substance of conversations they had had, or raised problems that plaintiff either had no control over, or problems which she had already resolved and had informed Vick of the resolution.

An example of this form of harassment is shown by the correspondence between Vick and plaintiff regarding unauthorized returns in 1977.

All of the Account Managers were experiencing unauthorized returns in 1977. This means that the merchandise was being sent back to the Revlon factory without being delivered to the stores assigned to the Account Managers. Unauthorized returns were strictly forbidden and were considered to be very serious when they did occur.

Plaintiff was greatly concerned for herself and the company with regard to unauthorized returns from her accounts. Her accounts were low on merchandise, but the goods that had been ordered for these accounts were being sent back to the warehouse. No one seemed to know the reason why. She sent memos to Vick saying she was desperate for merchandise and noted that the returns were costing her and the company a lot of money.

Plaintiff asked Vick to help her solve the problem but there is no evidence that he helped her in any way. It was only through plaintiff's own efforts that she discovered that United Parcel Service (UPS) had a policy not to deliver packages over a certain weight and were returning overweight packages of merchandise to the factory. Plaintiff found this out only after many phone calls and letters and visits to her accounts. James Anderson testified that he was very impressed with plaintiff's outstanding efforts in tracking down the cause of the problem.

In a memo to all Account Managers dated August 29, 1977, Vick acknowledged that much of the problem with unauthorized returns was caused by UPS, but thereafter he sent a number of memos to the plaintiff criticizing her for not being able to control her unauthorized returns. Vick continued to treat the problem as if it were the fault of the plaintiff and threatened her with the loss of her job if she could not resolve it.

Even though all the Account Managers were experiencing unauthorized returns, Vick did not threaten either of the men who testified with loss of their jobs over the issue, nor did he continue to assert that they could do anything about the problem once he found out that UPS was responsible.

This is also an example of Vick's failure to give plaintiff any constructive help when she requested it.

31) Two other female Account Managers found the treatment which they received from Vick to be so unbearable that they resigned their positions with Revlon as a result.

32) We find from the testimony of all of the women who testified, including plaintiff, that Vick was condescending and demeaning in his attitude towards them, that he criticized them unreasonably, that he never let them know how they could please him, and that he never gave them any real help.

Both Barbara DiRosario and plaintiff had been Account Managers under other supervisors and had never experienced this type of treatment from anyone else.

Cindy Drawbaugh-Beutner was a new Account Manager but had been with Revlon in another capacity for two years. Vick testified that she had had a good year but there were some problems. She was put on probation without warning. Drawbaugh also testified that she never had been treated this way by anyone else in the company.

Bruce Ikenberry also was a new Account Manager experiencing the same type of problems that all people face in a new position. He testified that Vick always treated him fairly and well; and James Anderson testified that he was always treated fairly and well by Bill Vick.

33) Vick gave the male Account Managers the authority to run their own territories and control their own accounts, but Vick did not give as much responsibility to the female Account Managers and would not allow the women to be in charge of their own territories or accounts.

Vick got along well with the women in his region who were willing to accept a position of lesser responsibility and authority than their male counterparts, and did not get along well with those female Account Managers who insisted on having the same amount of responsibility and authority as their male counterparts.

34) We find, therefore, that Vick treated women differently than he treated men who were similarly situated and treated the women differently than the men on account of their sex. It is obvious that Vick did not like women working for him in any position of authority. The stress and anxiety felt by plaintiff because of Vick's discriminatory treatment of her became so onerous and made her job so unbearable that plaintiff was forced to resign her position with the company on December 31, 1977.

35) In 1977, plaintiff's compensation from defendant was $18,528, including bonuses and commissions.

36) Plaintiff interviewed for several jobs soon after she left Revlon. In early February 1978, she interviewed with Clinique for a position as an Account Manager at a salary of about $2,000 per year less than she was earning at Revlon. The job would have been in Cincinnati, Ohio, and no travel was required, but plaintiff indicated during the interview with Clinique that she was unwilling to take less money than she had been earning at Revlon, and she was not selected for the job.

Plaintiff was also interviewed for a position with Houbigant in February 1978. However, when the person who interviewed her called back, plaintiff did not return the call because she was not interested in work-

ing with Houbigant because they offered compensation which was about $2,000 less than she had been earning at Revlon. The position was as an Account Manager in the Cincinnati market.

37) Plaintiff earned no income in 1978 and 1980.

She earned slight income in 1979, working as an insurance agent and as a commissioned sales person for a water softener company. In the fall of 1979, plaintiff commenced working as a legal secretary for her husband, earning no salary until September 1981 when she accepted employment with Riviera Trading Corp., for a salary of $31,-200.

## CONCLUSIONS OF LAW

1) This action is governed by Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, which makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, or conditions of employment because of such individual's race, color, religion, sex, or national origin. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(4).

2) Section 2000e(b) defines a covered employer as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day ... and any agent of such a person."

■ 3) Revlon is an employer within the meaning of the Act and Vick was at all times an agent of Revlon acting within the scope of his lawful authority.

4) Revlon is therefore liable for any discrimination practiced by its agent Vick against plaintiff Jan S. Rimedio.

■ 5) In all disparate treatment cases under Title VII, the burden is on plaintiff to prove a *prima facie* case of employment discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

■ 6) Plaintiff established a *prima facie* case of employment discrimination by showing that she was treated differently than male Account Managers similarly situated, because of her sex.

7) Plaintiff was treated differently than male Account Managers similarly situated with respect to the terms and conditions of her employment.

■ 8) The burden then shifted to the defendant to articulate a legitimate, non-discriminatory reason for the disparate treatment. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S.Ct. at 1824. The defendant's burden is not to prove a legitimate non-discriminatory motive for its actions; its only obligation is to articulate such a basis. It is sufficient if defendant's articulated reason raises a genuine issue of fact. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

■ 9) Defendant met its burden with the testimony of Vick that he treated people differently because of their ability and performance, not because of sex. This raises a genuine issue of fact whether the plaintiff was discriminated against because of her sex and the presumption raised by the *prima facie* case is rebutted. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094.

■ 10) The burden of proving discrimination remains with the plaintiff at all times. *Id.* at 256, 101 S.Ct. at 1095. Once the defendant has articulated a legitimate non-discriminatory reason for its actions, plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment action. This burden merges with the plaintiff's ultimate burden of persuading the Court that she has been the victim of intentional discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *see McDonnell Douglas Corp. v. Green*, 411 U.S. at 804, 93 S.Ct. at 1824.

■ 11) Plaintiff has proved that the proffered reason was merely a pretext and that defendant intentionally discriminated against plaintiff because of her sex. She

has convinced this Court that a discriminatory reason more likely motivated Vick than the reasons that he proffered. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

12) There was no evidence that plaintiff's job performance was so bad that it warranted the treatment she received. Other Account Managers under the supervision of Vick who experienced problems similar to the plaintiff's with their jobs, but none of the men who testified, received the same type of treatment as the plaintiff.

▮ 13) Vick discriminated against plaintiff and other women under his supervision in that he did not give the women as much authority as the men or treat the women with as much professional respect as their male counterparts. Neither did he treat them as fairly as he treated the men with regard to setting goals or in the evaluation of their job performance. Sexual discrimination often manifests itself in ways that are difficult to prove. Attitudes cannot be put on a graph and measured. Defendants often argue, as is argued here, that the women just do not perform a job as well, and that is the reason for the disparate treatment. Such a defense must be closely scrutinized.

If we were to accept defendant's proffered reason, we would have to believe that plaintiff started to perform inadequately at the same time that Vick came to her region. We would also have to believe that none of the women in the region performed well, except for those who accepted a position of less authority than their male counterparts and did not argue or assert their rights to equal treatment.

We cannot accept Vick's explanation for his behavior towards the plaintiff. No evidence was offered to show that plaintiff's job performance had changed significantly or that she did not, in fact, do as good a job as many of the men in the region who were not treated with the same disrespect and abuse.

▮ 14) Improper treatment of an individual is not grounds for recovery under Title VII unless the defendant treats that person differently because of a prohibited factor.

▮ 15) We find that Vick treated plaintiff differently because of her sex. None of the men in the region were treated with such disrespect, even though everyone experienced problems at one time or another. Vick harassed plaintiff for events over which she had no control. He worked against the plaintiff rather than with her, and there was no testimony or evidence that he treated any of the men in this fashion.

There was, however, testimony that he treated other women with the same disrespect and abuse with which he treated plaintiff. Two other women besides the plaintiff felt compelled to resign because of Vick's discriminatory treatment of them.

▮ 16) Intent to discriminate can be inferred from differences in treatment. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

17) Three women, including plaintiff, resigned their positions with Revlon because of the discriminatory treatment they received from Vick.

▮ 18) When an employer makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, the employer has effected a constructive discharge. *Jacobs v. Martin Sweets Co.*, 550 F.2d 364 (6th Cir.) *cert. denied* 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977); *Bourque v. Powell Electrical Manufacturing Company*, 617 F.2d 61 (5th Cir. 1980).

▮ 19) Just as Vick's intent to discriminate against plaintiff can be inferred from his actions, so too can his motive for doing so. We conclude that Vick's conduct in his dealings with the plaintiff was for the purpose of forcing her to resign. We are further satisfied that the working conditions encountered by the plaintiff became so intolerable that a reasonable person in plaintiff's shoes would have felt compelled to

resign. *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61 (5th Cir. 1980). Thus, while we find that Vick did intend to force plaintiff to resign, we wholly concur with the position of the United States Court of Appeals for the Fifth Circuit that when an employer makes working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, there is a constructive discharge. *Id.* at 65.

■ 20) Discrimination may make an employee's life so unpleasant as to amount to a constructive discharge. *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980).

21) Plaintiff's position with Revlon was involuntarily terminated by the defendant corporation because of the intentional discrimination she suffered on account of her sex.

■ 22) Plaintiff was constructively discharged and may therefore recover in damages for the loss of her job.

■ 23) Where discrimination has been found, the injured party is to be placed as nearly as possible in the position she would have been in had the discrimination not occurred. *Albemarle Paper Company v. Moody*, 422 U.S. 405, 418–19, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975).

■ 24) Plaintiff does not seek reinstatement to her former position with Revlon, and the appropriate remedy therefore is an award of back pay. 42 U.S.C. § 2000e–5(g).

25) Plaintiff sustained the burden of showing what her salary would have been had she not been unlawfully discharged by the defendant.

26) Plaintiff's salary at Revlon included commissions and bonuses.

27) Plaintiff offered no proof with regard to the value of fringe benefits.

■ 28) Amounts earnable with reasonable diligence by the person discriminated against shall operate to reduce the back pay otherwise allowable. 42 U.S.C. § 2000e–5(g).

■ 29) Once the employee establishes the amount of back pay she is entitled to receive, the burden shifts to the employer to prove what the plaintiff could have earned by the exercise of reasonable diligence. *Kaplan v. IATSE*, 525 F.2d 1354 (9th Cir. 1975); *Mabin v. Lear Siegler, Inc.*, 4 FEP 679 (W.D.Mich, 1971), *aff'd*, 457 F.2d 806 (6th Cir. 1972).

■ 30) An unlawfully discharged employee is not required to accept employment that is not the same or similar to the position previously held.

31) Defendant carried its burden of proof that plaintiff had the opportunity for employment of a similar type and nature with Houbigant, which she did not accept, because the compensation offered was $2,000 less than plaintiff was making at Revlon. Similarly, plaintiff informed Clinique that she was not interested in a similar job that paid $2,000 less than she was making at Revlon.

32) Both of these jobs were similar to the position plaintiff held at Revlon and neither job required any more travel than was required by her job with Revlon.

33) Defendant has proved that plaintiff could have obtained similar employment with the exercise of reasonable diligence.

■ 34) Because of the nature of the business with income dependent on sales and commissions in addition to salary, it was not reasonable for plaintiff to refuse employment with Houbigant at a salary of $2,000 less than she was making when she left Revlon, or to indicate to Clinique that she was not interested in a job paying $2,000 less than she was making at Revlon.

35) Plaintiff's established salary in 1977 included bonuses and commissions. Recovery for bonuses over and above what she earned in 1977 would be purely speculative.

■ 36) Plaintiff is entitled to full back pay up until the time she could have obtained employment with Houbigant or Clinique. We have determined that she likely would have begun work with Houbigant or Clinique on April 1, 1978. She is therefore

entitled to three months' full pay at $1,500 per month. Plaintiff is also entitled to the difference in compensation she would have received at Houbigant as opposed to what she was making when she left Revlon. This amounts to $2,000 per year for two and a half years. We assume for purposes of this award that the pay differential, including bonuses, commissions and raises would have remained the same.

37) Total amount of back pay to which plaintiff is entitled to $9,500.

38) Plaintiff is also entitled to an award of reasonable attorney fees and costs. 42 U.S.C. § 2000e–5(k).

39) Jurisdiction over this action is retained for purposes of determining the reasonableness of attorney fees charges.

It is hereby ORDERED that judgment be entered for plaintiff for $9,500, plus interest and costs. It is further ORDERED that the Court will award reasonable attorney fees and costs at the appropriate time.

SO ORDERED.