477 A.2d 1197

**Howard C. BEYE**

v.

**The BUREAU OF NATIONAL AFFAIRS, et al.**

**No. 1529, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

July 16, 1984.

644

Peter E. Derry, Washington, D.C., with whom were McChesney, Pyne & Duncan, P.C., Washington, D.C., on the brief, for appellant.

H. Kenneth Armstrong, Rockville, with whom were Donahue, Ehrmantraut & Montedonico, Chartered, Rockville, on the brief for appellee, Bureau of Nat. Affairs.

Albert D. Brault, Rockville, with whom were Janet S. Zigler and Brault, Graham, Scott & Brault, Rockville, on the brief for appellee, Shaw.

Jerry R. Goldstein and Topf, Zell, Kolodny & Goldstein, Bethesda, for appellee, Moore.

Jeff Evan Lowinger and Furey, Doolan & Abell, Chevy Chase, for appellee, Thomas.

Argued before MOYLAN, WILNER and ALPERT, JJ.

WILNER, Judge.

On or about February 8, 1982, appellant Howard Beye formally resigned his position as an employee of The Bureau of National Affairs (BNA). He was, at the time, an "at will" employee working in a BNA warehouse; he had no fixed term of employment.

In an amended declaration filed in the Circuit Court for Montgomery County, Beye averred that his resignation was coerced and thus constituted a constructive discharge, that it was engineered by three of his supervisors, Rudolph Thomas (Thomas), Edward Moore (Moore), and W.B. Shaw (Shaw), and that it was in retaliation for his having reported certain criminal activity on the part of BNA employees, including Thomas. More particularly, Beye alleged that:

(1) From 1971 to 1974, he received regular promotions and merit increases and was promised a promotion to the position of warehouse supervisor at BNA's Rockville distribution center.

(2) During that period, he became aware that Thomas was conducting illegal gambling operations and was operat-

ing a private business on company time; he reported those practices to BNA officials, and, when no action was taken, he reported the gambling activity to the Montgomery County police. As the result of evidence supplied by Beye, the police obtained a search warrant, but "did not make any arrests based on assurances by the defendant Shaw that the defendant BNA would handle the matter internally." No such action was ever taken, however, but thereafter Shaw became increasingly hostile to Beye.

(3) In 1976, the distribution center was reorganized, as a result of which Thomas became Beye's supervisor. In contrast to his earlier experience, Beye received no merit increases or salary reclassifications, and his performance ratings dropped from "superior" or "outstanding" to "average" or worse than average. Beye was harassed by fellow employees, including Thomas and Shaw, was refused a transfer, and was denied the promotion that had been promised to him.

(4) In 1981, Beye learned that certain BNA employees were using BNA facilities for the sale of marijuana. He reported that activity to the county police department and, at its request, acted as an informant. In that capacity, he made certain police-approved purchases of marijuana and one purchase of a stolen pistol. Based on this assistance, several BNA employees were arrested, indicted, and ultimately convicted of various controlled dangerous substance offenses; some were also indicted for unlawfully transporting a handgun.

(5) Following their arrest, these employees were released on bond and returned to work at BNA. One of them indirectly threatened Beye, *i.e.*, he communicated a threat to Moore who, in turn, informed Beye. Beye informed Moore, the manager at the center, of his role in the criminal investigation, and Moore promised to protect Beye. On February 2, 1982, Moore approved administrative leave for Beye "and advised him not to return to work at that time

because of the threat by the reemployed BNA worker and because Moore knew that Beye's safety was at stake."

(6) On February 8, 1982, Moore, with Shaw's approval, demanded that Beye return to work immediately or be fired. Moore refused to give Beye any assurances with respect to his safety and refused as well Beye's request for a transfer or for annual leave. Moore offered to permit Beye to resign, rather than be fired, with a promise of twenty-eight weeks severance pay, a letter of recommendation from BNA, and consideration for reemployment by BNA "after the situation involving the arrested BNA employees had been cleared up." In fear of his life and upon those promises, Beye signed a letter of resignation.

(7) Some of these promises were not kept. Beye received no letter of recommendation. He was denied his request for reinstatement and was told by Moore that he would never be considered for reemployment.[1] The actions of Thomas, Moore, and Shaw were done as agents for BNA.

Upon these averments, Beye sued BNA, Thomas, Moore, and Shaw in a five-count amended declaration. Count I, against all four defendants, was for abusive discharge; Beye claimed a wrongful constructive discharge in retaliation for his exposure of the criminal activity of BNA employees. Counts II and III charged BNA with breach of contract. Count II claimed the existence of a "common law contract of employment" based on Beye's "reasonable expectation of continued employment with BNA." Count III was premised on "the implied covenant of good faith and fair dealing existing in the employment contract between the parties," which, Beye asserted, precluded his discharge or forced resignation "without just cause." Count IV charged all four defendants with the intentional infliction of emotional distress, and Count V charged them with civil conspiracy.

---

1. We were informed at oral argument that Beye had received the twenty-eight weeks severance pay, although the amended declaration seems to aver the contrary.

All defendants demurred to the amended declaration. From the sustaining of those demurrers, without leave to amend, Beye brings this appeal and presents us with a nice thicket of issues. The underlying question, of course, is whether the averments of the amended declaration suffice to state one or more causes of action. More particularly, the questions, as presented by the parties, are as follows:

A. As to Count I:

(1) Is a cause of action for abusive discharge available when the employee has, in fact, resigned; is there such a thing as "constructive discharge" and, if so, is it sufficiently alleged in this case?

(2) If the cause of action exists in the case of a "constructive discharge," is it available where the discharge results from mere "whistle-blowing"—*i.e.*, the voluntary, unsolicited reporting of criminal activity on the part of fellow employees?

(3) In any event, does the action lie against anyone but the employer; can Thomas, Moore, and Shaw—individual company officials—be sued?

B. As to Counts II and III, does Maryland recognize "common law contracts of employment" or actions based on an "implied covenant of good faith and fair dealing" in what is otherwise an "at will" employment?

C. As to Count IV, do the allegations suffice to charge the tort of intentional infliction of emotional distress?

D. As to Count V, do the allegations suffice to charge a civil conspiracy?

It will not be necessary for us to address all of these issues. We shall conclude, on the basis of the averments in the amended declaration, that Mr. Beye was not constructively discharged, and that because he was not constructively discharged he was not abusively discharged. That determination will obviate the need to consider Questions A(2) or A(3) and will, of itself, supply the answer to Questions B and D.

## Count I—Abusive Discharge

In *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals, responding to questions certified to it by the United States District Court, concluded that (1) as a general rule, Maryland continues to adhere to the common law principle "that an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time" (p. 35 [432 A.2d 464]), but (2) Maryland does "recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." (p. 47 [432 A.2d 464]). *Adler* is the backdrop for our consideration of Count I; it is the well-spring of the theory of liability asserted by Mr. Beye.

In order to have an abusive discharge under *Adler*, there must, of course, first be a discharge—a termination of the at-will employment by the employer. Normally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge.

The law is not entirely blind, however. It is able, in most instances, to discard form for substance, to reject sham for reality. It therefore recognizes the concept of "constructive discharge"; in a proper case, it will overlook the fact that a termination was formally effected by a resignation if the record shows that the resignation was indeed an involuntary one, coerced by the employer.

The Court of Appeals flirted with this concept many years ago in *Cumb. & Penn. R.R. Co. v. Slack*, 45 Md. 161 (1876). The case focused on whether Slack, who had been employed by the railroad on an annual basis as a general superintendent, was discharged in violation of his contract. The record showed that on April 8, the company president informed Slack that he (the president) had decided to reorganize the local management of the railroad under one

head, and that he had selected one of the vice-presidents "to assume charge of the railroad." The letter continued:

"I presume you will prefer to retire by means of a resignation. It is hereby understood that the same is accepted, and you will please telegraph me of its transmission, as I have instructed the 2nd V. Prest. to take entire charge of the railroad immediately on receipt of my letter. Please confer with Mr. Millholland in turning over the papers in the Supt. office."

In response to this letter, Slack relinquished control to Millholland and left. The next day, he wrote to the company president, formally resigning the position of general superintendent, to take effect at once. He testified that he wrote that letter "because he was ordered to do it" in the president's letter. The Court agreed. At p. 175:

"In our opinion, that letter [from the president] operated as a positive and peremptory dismissal of the appellee [Slack] from the service of the company; his note written the next day cannot change its character or construction, it does not show that he voluntarily resigned, nor can it be construed as acquiescing in his dismissal.... Construing these papers in the light of all the circumstances, it seems impossible to escape the conclusion that [Slack] correctly understood [the president's] letter as a positive and final discharge, leaving him no option or choice in the matter...."

That case was, of course, rather clear-cut. The more recent cases are less so. Most often arising under the Federal labor relations or civil rights acts, they usually do not involve resignations so directly required, but rather present situations of employees quitting in response to what they regard as unfair and onerous working conditions. It is largely in that context that the courts—primarily the Federal courts—have dealt with the concept of constructive discharge.

There seems to be little dispute over the definition of the concept. Though not always employing precisely the same

language, most courts seem to have adopted the rule that a constructive discharge occurs in this context when an employer deliberately causes or allows the employee's working conditions to become "so intolerable" that the employee is forced into an involuntary resignation. *See Young v. Southwestern Savings and Loan Association,* 509 F.2d 140, 144 (5th Cir.1975), and cases cited therein; *Bourque v. Powell Electrical Mfg. Co.,* 617 F.2d 61 (5th Cir.1980); *Thompson v. McDonnell Douglas Corp.,* 552 F.2d 220 (8th Cir.1977); *Johnson v. Nordstrom-Larpenteur Agcy., Inc.* 623 F.2d 1279 (8th Cir.), *cert. denied* 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980); *Muller v. United States Steel Corporation,* 509 F.2d 923 (10th Cir.), *cert. denied* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *Irving v. Dubuque Packing Co.,* 689 F.2d 170 (10th Cir.1982); *J.P. Stevens & Co., Inc. v. N.L.R.B.,* 461 F.2d 490 (4th Cir.1972); *Neale v. Dillon,* 534 F.Supp. 1381 (E.D.N.Y.), *aff'd mem.* 714 F.2d 116 (2d Cir.1982); but *compare Coe v. Yellow Freight System, Inc.,* 646 F.2d 444 (10th Cir.1981). *See also* Baxter and Farrell, *Constructive Discharge—When Quitting Means Getting Fired,* F.Empl.Rel.L.J. 346–68 (Wint. 1981/82); Annot., *Circumstances In Title VII Employment Discrimination Cases (42 USCS §§ 2000e et seq.) Which Warrant Finding Of "Constructive Discharge" Of Discriminatee Who Resigns Employment,* 55 A.L.R.Fed. 418 (1981).

In applying this standard, courts have had to wrestle with at least two subsidiary, and somewhat overlapping, questions; namely, (1) whether, in order to have a constructive discharge, the employer's acts (or omissions) must have been taken with the express intention of forcing a resignation, and (2) what criterion should be used to determine whether the conditions actually prompting the resignation were, in fact or in law, so intolerable as to justify deeming the resignation an involuntary one.

As to the first question, some courts have suggested that a constructive discharge does not occur unless the employer's actions are both deliberate and taken with the intention

of forcing a resignation. *See, for example, Muller v. United States Steel Corp., supra,* 509 F.2d 923, 929; *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981); *Greenspan v. Automobile Club of Michigan,* 495 F.Supp. 1021 (E.D.Mich.1980); *Carino v. Univ. of Oklahoma,* 25 FEP Cases 1332 (W.D.Okla.1981); and *cf. J.P. Stevens & Co., Inc. v. N.L.R.B., supra,* 461 F.2d 490. In most of the decisions, however, and particularly in the cases arising under the civil rights laws, such express intent has not been regarded as necessary. It suffices if the employer's actions were deliberate or, in cases of harassment by supervisors or fellow employees, if the employer was aware of the situation and permitted it to continue. *See Bourque v. Powell Electrical Mfg. Co., supra,* 617 F.2d 61; *Calcote v. Texas Educational Foundation,* 578 F.2d 95 (5th Cir.1978); *Young v. Southwestern Savings and Loan Association, supra,* 509 F.2d 140; *Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071 (5th Cir.1981); *Clark v. Marsh,* 665 F.2d 1168 (D.C.Cir.1981); *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114 (1st Cir.1977); *E.E. O.C. v. Hay Associates,* 545 F.Supp. 1064, 1085 (E.D.Pa. 1982); *Frazer v. KFC National Management Co.,* 491 F.Supp. 1099 (M.D.Ga.1980), *aff'd mem.* 636 F.2d 313 (5th Cir.1981). Indeed, in some instances the employer may not wish a separation at all. *See, for example, Young v. Southwestern Savings and Loan Association, supra,* 509 F.2d 140.

There seems to be more agreement as to the second question. In judging whether a resignation is truly involuntary, the courts have applied an objective standard; the test is not whether the particular employee felt it necessary to resign, but whether "a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado v. Garcia Santiago, supra,* 562 F.2d 114, 119; *Bourque v. Powell Electrical Mfg. Co., supra,* 617 F.2d 61; *Vaughn v. Pool Offshore Co., etc.,* 683 F.2d 922 (5th Cir.1982); *Jacobs v. Martin Sweets Co., Inc.,* 550 F.2d 364 (6th Cir.), *cert. denied* 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977);

*Held v. Gulf Oil Co.,* 684 F.2d 427 (6th Cir.1982); *Rimedio v. Revlon, Inc.,* 528 F.Supp. 1380 (S.D.Ohio 1982).

■ None of these cases involved actions for abusive discharge under *Adler* principles, but we see no reason why the basic concept and definition of constructive discharge established by them should not apply as well to an abusive discharge case. The ultimate facts necessary to establish an unfair labor practice under the Federal labor laws or an unlawful employment practice under the civil rights laws may differ from what is required for an abusive discharge under *Adler,* but the considerations attendant to a determination of whether a resignation is voluntary or involuntary would seem to us to be essentially the same. If an employer directly discharges an at-will employee in such manner as to make the discharge an abusive one under *Adler,* it would defy both reason and fairness to immunize him from liability simply because he has been clever enough to effect the abusive separation by forcing a resignation. That would, in effect, reward him for the extra measure of malefaction—of not only acting in contravention of some clearly mandated public policy but of making things so intolerable that the employee is forced to initiate his own unlawful termination.

■ Accordingly, we conclude that (1) the concept of constructive discharge is recognized in Maryland, (2) an action for abusive discharge under *Adler* may be founded upon a constructive discharge, and (3) where a resignation is purportedly prompted by working conditions, the applicable standard to determine if the resignation is, in effect, a constructive discharge, is whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign.

In the case before us, although Mr. Beye has certainly claimed that he was constructively discharged, the underlying basis for that allegation is somewhat ambiguous. Reading Count I in its entirety, including the prefatory averments incorporated therein by reference, it appears, in a

nutshell, that Mr. Beye resigned to avoid being fired, that he was threatened with being fired because he refused to return to work, that he refused to return to work for fear that he might be injured by one or more of the fellow workers he had reported to the police, and that BNA had declined to allay that fear by refusing to transfer him or to give him "assurances for his safety."

This circumstantial progression can be read in two ways: one, that Beye resigned because of fearful working conditions that BNA refused to correct, or, two, that he resigned simply in order to avoid being fired. The first approach implicates the considerations noted in the recent labor and civil rights cases; the focus is on whether the underlying working conditions were sufficiently deliberate and intolerable. The second approach looks more precisely at the character of the event itself; was the resignation really voluntary or was it, as in *Cumb. & Penn. R.R. Co. v. Slack, supra,* 45 Md. 161, simply a perfunctory gesture in response to a *fait accompli?*

Beye seems at times to be arguing both approaches, although conceptually they may lead to different results. We think that the first approach is the better, and more realistic, way to consider the amended declaration. One cannot so easily, or properly, disassociate the ultimate termination from its root causes. The choice of dismissal or resignation came about only because Mr. Beye refused to return to work. If that refusal was *legally* justified under the caselaw we have cited, there has been a constructive discharge; if it was *not* so justified, there has *not* been a constructive discharge. The legal sufficiency of the cause, then, and not the choice which it produced, is necessarily the critical and controlling factor.

In this regard, the problem is not so much what Beye *says* in his amended declaration as what he omits to say. Although he mentions the episode with Thomas occurring some time in or before 1974, that clearly was not the cause for his ultimate termination. He does not claim that the

criminal activity on the part of the other employees was known to or tolerated by BNA or that BNA in any way promoted or acquiesced in any threats by them against Beye. Moreover, there is no allegation that BNA was in a position to satisfy any of the conditions that Beye laid down for his return to work—that it had the practical ability to protect him from his fellow employees, that there was another position to which he could have been transferred, or that BNA would be able to conduct its business efficiently with him on some sort of indefinite leave. Beye does not suggest that BNA should or could have terminated the employment of the fellow employees feared by him, only one of whom apparently made some undefined threat.

The fact is that Mr. Beye opted to permit his employment to be terminated because of a condition which his employer neither created nor could reasonably be expected to control.

■ Mr. Beye showed courage in reporting the criminal activity that he observed. He acted as a good citizen should, and he is to be applauded for it, not condemned or belittled. Under the circumstances, we have no doubt that his apprehension about continuing to work with the people he reported was both genuine and reasonable, and that his decision not to return may well have been a prudent one from his perspective. But the burden or consequence of that apprehension, however justified it may be, cannot be thrust upon an otherwise innocent and neutral employer. Although an employer has a general obligation to provide a safe workplace for his employees (*see Athas v. Hill,* 300 Md. 133, 476 A.2d 710 (1984), aside from his obligations under the workmen's compensation act, we know of no law that makes him an insurer against personal attacks by fellow employees in response to private, non-employment related grievances they may have. *See McVey v. Gerrald,* 172 Md. 595, 602, 192 A. 789 (1937); *Leonard v. Sav-A-Stop Services,* 289 Md. 204, 218, 424 A.2d 336 (1981). *Cf. Schatz v. York Steak House Sys.,* 51 Md.App. 494, 444 A.2d 1045 (1982). The employer cannot be expected to police the

workplace to that degree, and he cannot be held to have coerced a resignation by refusing to undertake such a duty.

■ We therefore conclude that Mr. Beye has failed to allege facts sufficient to plead a constructive discharge, and, in the absence thereof, has also failed to set forth a case of abusive discharge. For that reason, we believe that the demurrer was properly sustained with respect to Count I.

## Counts II and III

■ Counts II and III charge BNA with breach of contract. They each incorporate by reference all of the allegations expressed or incorporated in Count I and are premised on the theory that Beye had an enforceable contract and that he was constructively and improperly discharged.

Both counts suffer from the same two fatal weaknesses: first, for the reasons noted, there has been no constructive discharge, and therefore no breach; and, second, under *Adler*, Beye's employment was "at will" and therefore could be "legally terminated at the pleasure of either party at any time." 291 Md. at 35 [432 A.2d 464].

## Count IV

■ Count IV seeks to charge all four defendants with the tort of intentional infliction of emotional distress. To establish that cause of action, Beye asserts that (1) for six years, from 1976–1982, Thomas and Shaw gave him poor performance ratings, "threatened to fire him, harassed him and physically assaulted him"; (2) BNA passed him over for promotion in favor of employees with less seniority and appointed Thomas as his supervisor with knowledge of Thomas's "prior illegal activity and the efforts of … Beye to ferret it out and to have it prosecuted"; and (3) Moore deceived him into resigning. These acts, he claims, resulted in his affliction with severe emotional distress.

The tort of intentional infliction of emotional distress was first formally recognized in Maryland in *Harris v. Jones*,

281 Md. 560, 380 A.2d 611 (1977). Borrowing from *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974), the Court [281 Md. 560], at p. 566 [380 A.2d 611],

"identified four elements which must coalesce to impose liability for intentional infliction of emotional distress:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress; [and]

(4) The emotional distress must be severe."

The Court elaborated on three of these elements. A defendant's conduct is intentional or reckless, it said (p. 567 [380 A.2d 611]), when "he desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow." For conduct to be "extreme and outrageous," it must "go beyond all possible bounds of decency, and ... be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*, 567 [380 A.2d 611], quoting from Restatement of Torts 2d, § 46, comment d. Although extreme and outrageous conduct may arise from a defendant's "abuse of a position, or relation with another person, which gives him actual or apparent authority over him," and the conduct of such a person "will be carefully scrutinized by the Courts" (*id.*, 569 [380 A.2d 611]) still, the conduct, to be actionable, must go beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.*, 567 [380 A.2d 611], again quoting Restatement of Torts 2d, § 46, comment d.

The fourth element—severity—has been held to require emotional distress "of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 397, 89 Cal.Rptr. 78 (1970), quoted in *Harris* [281 Md.] p. 572 [380 A.2d 611].

Against these standards, Count IV is woefully inadequate. Although some of the proper adjectives and adverbs are present, the underlying allegations fall far short of establishing any of the four elements. *See also Continental Cas. Co. v. Mirabile,* 52 Md.App. 387, 449 A.2d 1176, *cert. denied,* 294 Md. 652 (1982).

### Count V

Count V appears to charge two distinct conspiracies. First, it asserts that Moore and Shaw conspired between themselves and with other employees of BNA to deny Beye "any raises, advancements or promotions from 1976 onward." This conspiracy, Beye claims, "consisted of the defendant Thomas consistently rating the plaintiff's job performance as inferior and unsatisfactory, and the defendants Moore and Shaw and other employees of the defendant BNA approving such job performance ratings, although the defendants knew that these performance ratings were not true." All this was done, Beye says, to deny advancement to him and with the desire that he quit his job and thus cease to expose criminal activity.

Second, Beye avers that Moore and Shaw conspired to "wrongfully terminate the employment of the plaintiff with BNA" by compelling him "to return to work or be fired" although they knew that threats had been made against him.

The individual defendants, Beye contends, were motivated by their personal desires for revenge; their acts, he avers, were "approved and ratified" by BNA.

■■■ A civil conspiracy "is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Wash. Sub. San. Comm'n,* 259 Md. 206, 221, 269 A.2d 815 (1970). Requisite to establishing a conspiracy, then, is a showing that the object of the agree-

ment is either an unlawful act or a lawful act to be accomplished by unlawful means.

██ In his brief, Beye tells us that "[t]he unlawful objective and the unlawful act in the instant case were embodied in the wrongful discharge of Beye." That is how he construes the averments of Count V. So construed, Count V necessarily stands or falls on the issue of whether Beye was wrongfully discharged. We have, of course, concluded that, upon the averments in Count I, he was not discharged at all; the conditions alleged to exist were not, under the caselaw, so intolerable as to require his resignation. If those conditions did not suffice to justify the resignation, we do not see how their creation could suffice as or constitute a civil conspiracy.

For these reasons, we find no error in the sustaining of the defendants' respective demurrers.

JUDGMENTS AFFIRMED;

APPELLANT TO PAY THE COSTS.