Gertrude M. JARMAN

v.

**DEPARTMENT OF COMMERCE,**
Bureau of the Census,
Washington, D.C.

Civ. No. Y–85–4408.

United States District Court,
D. Maryland,

May 28, 1986.

Gertrude M. Jarman, pro se.

James S. Perry, Asst. U.S. Atty., Eastern District of N.C., Raleigh, N.C., Breckinridge L. Willcox, U.S. Atty., for Md., Baltimore, Md., and Robert J. Mathias, Asst. U.S. Atty., Baltimore, Md., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

This is an action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e–16 for discrimination on the basis of gender and race. Plaintiff, Gertrude M. Jarman, is a black female who alleges that she was subjected to disparate treatment when the government failed to promote her to a vacant position for which she was qualified. She also alleges that the discrimination was effectively a constructive discharge. A one-day bench trial was held on May 16, 1986. For the reasons which follow, the Court finds in favor of the defendant.

FACTS

Jarman was first employed with the Bureau of the Census for one year in 1971–72, until she voluntarily resigned from her position as a GS–4 Statistical Clerk. In 1973, she returned to her job, and by 1976 she had worked her way up to the position of a GS–6, Statistical Assistant. At that point, she decided to go back to school and she resigned from her job. On October 7, 1979, plaintiff was reinstated as a GS–6, Statistical Assistant with the Population Division of the Bureau of the Census, and she remained in that position until July 10, 1981.

On November 11, 1980, the GS–7 Supervisory Statistical Assistant in Jarman's unit died, creating a vacancy. Jarman requested an automatic promotion to the GS–7 position, but no action was taken by the Bureau to fill the position. Jarman continued to pursue the promotion, but a hiring freeze was imposed on February 24, 1981, which eliminated the possibility of any prompt action. To this date, the vacated position has not been filled.

Jarman asserts that there was no attempt to fill the GS–7 vacancy because the Bureau did not want to promote a black woman. Jarman points out that she was qualified for the increased responsibility— having performed supervisory duties in prior jobs—and that she was in serious need of the pay increase. According to Jarman's testimony, her supervisor, Gordan W. Green, was evasive in response to her requests for the promotion, yet he implied that a promotion was highly likely. She insists that his action strung her along, and prevented her from pursuing higher paying jobs elsewhere. She also notes that Green assigned special projects for her to work on, and that she believed her job should have been reclassified and upgraded in recognition of the greater responsibility. Jarman does concede, however, that the work which previously had been performed by the former GS–7 supervisor was assumed by a higher level supervisor, and did not impose additional responsibilities on Jarman.

Jarman also contends that there was pervasive racism within the Bureau, and that the discrimination against her was part of this pattern. She offers as evidence the example of Green, her supervisor who is a white male, receiving preferential treatment when he was promoted from the position of Branch Chief to the GS–15 professional position of Assistant Division Chief. Jarman does not contend that she was competing with Green; instead she maintains that preferential treatment was demonstrated when the Bureau rushed to fill the GS–15 vacancy by a white male in merely two months, while the Bureau avoided filling the GS–7 position over the course of four months because it would have promoted a black female. The GS–15 position

opened up one month before the GS–7 position became available. Furthermore, Jarman alleges that by filling the GS–15 position with a white male, the Bureau discriminated against a black female and a Jewish male who both were qualified for the promotion. But, Jarman offered no evidence that Green was not the most qualified applicant for the GS–15 position.

Finally, Jarman described the stress of continuing to work in a discriminatory environment in which she was denied a deserved promotion as too great for her to bear, especially in light of a prior stress-related cerebral hemorrhage. As a result, she felt that she had to leave her job. She did concede, however, that part of her motivation for leaving the job was financial.

The defendant insists that there were legitimate non-discriminatory reasons for its behavior. The government contends that the entire incident occurred within the context of severe budgetary restrictions, and that it was attempting to reduce expenses. Green testified that the GS–7 position could only be filled after the job had been posted, allowing persons to compete for the position. According to Green, no requests for posting vacant positions were being processed in November, 1980, in anticipation of the February, 1981 hiring freeze. Nancy Hope, the administrative officer of the Bureau of the Census, testified that the process of posting positions normally takes one to four months, and confirmed that posting was required before promoting Jarman to the GS–7 position. Thus, the government's contention is that it never accepted applications for the GS–7 job, and in fact, Green testified that the position was eventually abolished without ever being filled.

In response to the charge of preferential treatment by quickly promoting Green, the government concedes that it was a priority to fill the vacant GS–15 position. But, Roger A. Herriot, who was the Division Chief as of October, 1980, explained that it was good management practice to fill the

upper level position promptly, and that race and gender played no role.

## TITLE VII CLAIM

■ Plaintiff's Title VII claim alleges disparate treatment on the basis of race and gender. There is no direct evidence of discrimination, but plaintiff may establish a *prima facie* case of discriminatory treatment by showing (i) that she belongs to a racial minority (or a protected class); (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Gairola v. Commonwealth of Virginia Department of General Services,* 753 F.2d 1281, 1286 (4th Cir.1985).

■ If the plaintiff satisfies this initial burden, the employer has the burden of producing evidence of some legitimate, non-discriminatory reason for the employee's rejection. Then the plaintiff has the final burden of persuasion, to show that the reasons asserted by the employer were in fact pretext. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ In this case, it is doubtful that the plaintiff satisfied her initial burden of establishing a *prima facie* case of discrimination. Although she expressed interest in being promoted to a position which she perceived as vacant, plaintiff has not shown that her employer was seeking applicants either at the time she hoped for the promotion or after she terminated her employment. Giving the plaintiff every benefit, however, the Court will conclude that her burden was established because of her contentions that the employer avoided posting the position for discriminatory reasons.

The government has presented evidence of a legitimate, non-discriminatory reason for its failure to promote plaintiff to the GS-7 position. Budgetary reasons for reducing the number of employees by attrition are facially non-discriminatory. But, plaintiff has failed to satisfy her final burden of persuading this Court that the government's explanation for its decision not to fill the GS-7 position was mere pretext for discrimination. Plaintiff made an impassioned speech about the unfairness and inhumanity of the refusal to promote her to a position which was vacant. Her complaint was essentially about perceived inequities within "the system" rather than one of race and gender discrimination. However legitimate her observations may be about the failures of a government bureaucracy to be sensitive to her personal needs, she has not met her burden for a case of discrimination under Title VII.

## CONSTRUCTIVE DISCHARGE

Similarly, plaintiff has not met her burden of proving that she was constructively discharged from her employment because of the discrimination. To prove a case of constructive discharge, the plaintiff must show that her former employer deliberately caused or allowed her working conditions to become so intolerable that a reasonable person in her place would have felt compelled to resign. *Beye v. Bureau of National Affairs*, 59 Md.App. 642, 477 A.2d 1197 (1984). This doctrine is basically an extension of an action for abusive discharge, which occurs where there has been a discharge in contravention of public policy. *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). Plaintiff has not demonstrated that she was discriminated against, nor has she demonstrated that her working conditions became so intolerable that a reasonable person in her place would have felt compelled to resign.

Accordingly, this Court finds in favor of the defendant.