DENISE SEERY *v.* YALE-NEW HAVEN HOSPITAL ET AL.

THOMAS GUCKIAN *v.* YALE-NEW HAVEN HOSPITAL ET AL.
(6376)

BORDEN, STOUGHTON and NORCOTT, Js.

Argued October 19, 1988—decision released February 28, 1989

*Joseph D. Garrison,* for the appellants (plaintiffs).

*William J. Doyle,* with whom were *Kenneth Rosenthal* and, on the brief, *S. Robert Jelley,* for the appellees (defendants).

STOUGHTON, J. This is an appeal by the plaintiffs from the judgments rendered on verdicts that the trial court directed the jury to return in favor of all defendants.

One of the plaintiffs, Denise Seery, was a nurse anesthetist employed by Yale-New Haven Hospital. In November, 1982, she instituted an action claiming that she had been constructively discharged on or about March 29, 1981, and that the constructive discharge was tortious and retaliatory in contravention of the pub-

lic policy of this state and in violation of the covenant of good faith and fair dealing in her contract of employment. The other plaintiff, Thomas Guckian, was employed by the hospital as an anesthesiologist. In January, 1983, he instituted an action claiming that certain action taken by the defendant hospital amounted to a tortious, retaliatory discharge in contravention of the public policy of the state and in violation of the covenant of good faith and fair dealing in his contract of employment.[1] The defendants are the hospital, Yale University and its school of medicine, and certain officers of the corporate defendants. The two cases were tried together by agreement of the parties.

The plaintiffs claim that the trial court erred (1) in granting the defendants' motion for directed verdicts, and (2) in ruling that the plaintiffs could not recover damages for pain and suffering. Each of the plaintiffs moved the trial court to set aside the verdict and for a new trial, and each of the motions was denied.

Generally, a trial court should direct a verdict only when a jury could not reasonably and logically reach any other result, and in reviewing the action of the trial court we review the evidence in the light most favorable to the party against whose interest the verdict was directed. *Daley* v. *Gaitor,* 16 Conn. App. 379, 384, 547 A.2d 1375 (1988).

The plaintiffs offered evidence from which the jury might have found that in December, 1971, Seery began employment on the staff of the hospital. One month later, Guckian was hired by the hospital. The plaintiffs previously had worked together at a different hospital. In October, 1979, the plaintiffs were assigned to

---

[1] The plaintiffs have not addressed contract violation claims in their brief. Hence, any such claims are deemed abandoned and will not be reviewed. *Ernst Steel Corporation* v. *Reliance Ins. Co.,* 13 Conn. App. 253, 260, 536 A.2d 969 (1988).

the hospital's one day surgery unit for operations not requiring overnight care, and, for the following year and one-half, they were the only persons responsible for anesthesiology services on that unit. In February, 1980, Seery received a written reprimand from Luke Kitahata, chief of anesthesiology, for refusing to cover for a nurse anesthetist on another hospital unit. Seery filed a grievance and, after a meeting with Seery and Guckian, the hospital instituted a new reporting structure that was more satisfactory to them.

In July, 1981, a second anesthesiologist, E-Fun Tsai, was assigned to the one day surgery unit to help with the increased number of patients. Tsai was returning to the hospital after a six month leave of absence. Tsai and the hospital had agreed to the leave of absence following a January, 1981 incident in which Tsai had needed assistance in administering anesthesia because, as she admitted, on that day she had ingested two prescription sedatives. This incident followed reported episodes in October, 1977, and October, 1980, in which Tsai admitted that her ingestion of prescription sedatives had interfered with her duties. The hospital was aware of these incidents, but did not notify the state department of health. During the six month leave of absence, the hospital insisted that Tsai seek psychiatric treatment, which she did. A report filed by her psychiatrist recommended that she be placed on daytime clinical duties. Pursuant to this report, Tsai was assigned to the one day surgery unit on the condition that she continue psychiatric treatment. The assignment was also conditioned on the approval of Guckian, who was told to monitor Tsai.

On November 9, 1981, Seery claimed that she was subjected to an unprovoked physical and verbal attack by Tsai. Tsai claimed that Seery was the aggressor. There were no witnesses to this incident. On November 12, both Seery and Tsai received letters reprimand-

ing them equally for unprofessional conduct and warning them that any repetition would result in "severe disciplinary action up to and including discharge." These letters were placed in their respective personnel files.

Seery strenuously protested and, after speaking with Lawrence Pickett, the chief of staff, she obtained a meeting with Kitahata and other hospital administrators, and demanded that the letter be removed. The hospital refused to remove the letter, and, thereafter, Seery pursued the hospital's grievance procedure and obtained legal counsel. Her lawyer wrote a letter demanding that the letter be removed and adding that if her demands were not met she would "go public." On or about November 13, Seery called Joseph Camilleri of the Professional Standard Review Organization (PSRO), which is a federal organization that monitors the quality of care given to Medicare patients, to complain that there was a doctor at Yale-New Haven Hospital who might be impaired. Camilleri, who was the medical director and executive director of the PSRO, relayed this complaint to Pickett. Seery had another meeting with Pickett during which Pickett told her that she could either bring a lawsuit or make a complaint to the division of medical quality assurance of the department of health. Pickett informed Seery that he was currently serving on the division's complaint panel. When Seery asked him if she would be wasting her time in filing a complaint, Pickett made no response.

In January, 1982, Seery contacted the department of health and spoke with a hearing officer. She explained that there was a physician at the hospital who was possibly impaired. The hearing officer stated that he knew Pickett and would tell him that Seery was going to file a complaint. Seery received complaint forms in February, but did not file the complaint until

April 28. Although she filled out the forms in February, she did not file them immediately because she hoped Pickett would begin a proper internal investigation. She filed the complaint after it became apparent that an investigation would not come to pass, and after she had resigned from the hospital staff.

In February, 1982, Seery pursued the hospital's three-step grievance procedure. At the first level, she met with Kitahata, Robert I. Schrier, vice-chairman of the anesthesiology department, Guckian, and hospital administrators, Thomas Reilly and Lawrence Perlstein. At this meeting, Seery stated that she was there to rescue her reputation and that she wanted the written warning removed from her file and a written apology from Tsai. At the meeting, Tsai made an oral apology and Schrier agreed to remove the warning from the file in three months. Seery stated that she did not accept this offer because she refused to accept any blame for the incident and she wanted a written apology from Tsai.

Seery then pursued the second step of the grievance process and put the grievance in writing and sent it to the vice-president of the department, Bruce Kominske. Seery received a written response in which Kominske stated that he found the warning letter to be appropriate and that it would be inappropriate to force Tsai to reiterate her apology in writing.

Seery still was not satisfied. At the third step, Seery met with the hospital's executive vice-president, Joseph Zaccagnino. Guckian attended this meeting as Seery's advisor. At this meeting, both Guckian and Seery attacked the credibility of Tsai's version of the altercation by referring to her history of personal problems. In addition, Guckian recounted two recent cases in which he questioned Tsai's medical judgment. Under questioning, Guckian admitted that he had neither

investigated nor taken corrective action with respect to these two cases even though he was the anesthesiologist in charge of the unit. Zaccagnino then initiated an investigation on behalf of the hospital.

Also in February, the hospital denied Seery's request for a leave of absence from March 1 to March 5. The hospital claimed it denied Seery's request because Guckian had already been scheduled to be away for the same period and the hospital did not want to be short-handed. Seery was absent despite the denial of her request. She had sought the leave for two reasons: because she desired treatment for a medical problem; and because Tsai would be left in charge of the unit while Guckian was away. When Seery returned, she received another letter of reprimand. She testified that she felt that the hospital was paving the way for her dismissal. A few days later, on March 29, she learned that Guckian would be going on an extended leave of absence. Because she felt that she would be left under the direction of Tsai, Seery immediately resigned. Seery testified that she felt the conditions would be intolerable because Tsai was not in control of herself and was not in a condition to control the unit.

Following the February meeting with Seery and Zaccagnino, at which Guckian had questioned Tsai's medical judgment, Zaccagnino had initiated an investigation by the hospital. A meeting was held on March 25, between Guckian, Kitahata, and other hospital officials. Guckian refused to submit any written documentation concerning his allegations about Tsai because, as he testified at trial, he did not want to be misinterpreted and thereby accused of calling Tsai incompetent. He acknowledged that the two incidents involved no more than a matter of judgment. Guckian testified that all he wanted was to have the hospital investigate the possibility that Tsai was impaired. As

a result of this meeting, Kitahata and another doctor were assigned to supervise and monitor Tsai's work.

On March 30, Guckian went on an approved three week medical leave of absence. When he failed to return to work after that period, the hospital asked him to submit disability forms and medical documentation. Guckian testified that on April 23 he had called Kitahata and told him that he and Seery could not participate in this brand of medicine until the matter had been resolved to their satisfaction. He said that Kitahata's response was that Kitahata was not going to rehire Guckian and Seery, and that he told Kitahata that they were not asking to be rehired.[2] On May 5, the hospital requested that Guckian submit medical verification by May 10. On May 20, the hospital sent a letter stating that if it did not receive any communication by May 28, it would assume that Guckian no longer wished to continue his employment. This letter was not delivered. On June 25, Guckian was notified by letter that the hospital considered him to have resigned voluntarily on May 28. With this letter, the hospital sent the letter of May 28. Guckian testified that he never made any written response to these letters and that from late May until mid-June he was on vacation in Ireland.

Meanwhile, on April 2, the hospital had concluded that there was no basis for any concern about either Tsai or the two incidents reported by Guckian. About

---

[2] Guckian went on to testify that he had received letters after April 23, from Kitahata and the hospital concerning his return to work, and that on May 10, he and Kitahata discussed his vacation which had been scheduled for May 27. He stated that Kitahata agreed that he could start this vacation a few days earlier.

This testimony suggests that Kitahata believed that Guckian was still employed by the hospital and raises a question about what Kitahata said to Guckian. We note that in his testimony, Kitahata said that he told Guckian that he would not rehire Seery.

this time, Kitahata wrote a memorandum that was supportive of Tsai. On April 29, Pickett, in response to this memorandum, wrote a letter to Kitahata in which he stated "I wonder if it isn't Dr. Guckian we should think about terminating."

The plaintiffs contend that they put forth sufficient evidence for a jury to decide reasonably and legally that they had been discharged in violation of public policy. See *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 474, 427 A.2d 385 (1980); *Girgenti* v. *Cali-Con, Inc.*, 15 Conn. App. 130, 137, 544 A.2d 655 (1988). In *Sheets*, our Supreme Court recognized "a common law cause of action in tort for discharges 'if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy.'" (Emphasis in original.) *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986). *Sheets* is an exception to the general rule that an "at will" employee may be terminated for any reason.[3] See *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 562–63, 479 A.2d 781 (1984).

In an action under *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, the former employee has the burden of pleading and proving that his or her dismissal occurred for a reason that violates public policy. *Morris* v. *Hartford Courant Co.*, supra, 679; *Girgenti* v. *Cali-Con, Inc.*, supra. The *Sheets* exception has been narrowly construed and requires proof on the part of the former employee that the discharge was for a demonstrably improper reason. See *Morris* v. *Hartford Courant Co.*, supra, 678–79; *Girgenti* v. *Cali-Con, Inc.*, supra.

---

[3] Generally, an agreement for permanent employment or for an indefinite period is terminated at will by either party without incurring liability. *Fisher* v. *Jackson*, 142 Conn. 734, 118 A.2d 316 (1955). Neither party suggests that the plaintiffs were anything but "at will" employees.

Seery's complaint alleged that she had been "constructively discharged" in violation of public policy. The hospital maintains that it did not discharge Seery, but rather that she voluntarily resigned.

"Constructive discharge occurs when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign." *Neale* v. *Dillon,* 534 F. Sup. 1381, 1390, aff'd, 714 F.2d 116 (2d Cir. 1982). See generally, annot., Constructive Discharge—Title VII, 55 A.L.R. Fed. 418. A claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign. *Neale* v. *Dillon,* supra; *Beye* v. *Bureau of National Affairs,* 59 Md. App. 642, 649, 477 A.2d 1197, 1201 (1984).

"Normally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge." *Beye* v. *Bureau of National Affairs,* supra. Through the use of constructive discharge, the law recognizes that an employee's "voluntary" resignation may be, in reality, a dismissal by the employer. See id.

A constructive discharge in and of itself will not entitle an at will employee to prevail on a cause of action brought under *Sheets,* however, because the employee must still prove that the dismissal, in whatever form, occurred for a reason violating public policy. See *Morris* v. *Hartford Courant Co.,* supra, 679.

In its memorandum of decision, the trial court noted that the complaint did not allege that the hospital had violated any statute or regulation, but that the plaintiffs had offered into evidence a copy of General Statutes § 20-13d.[4] The court stated that it presumed that

[4] General Statutes § 20-13d provides in pertinent part: "(a) The state society or any county society or any physician or hospital shall within thirty

the plaintiffs' theory of the case was based upon § 20-13d. The court directed a verdict for the hospital on the ground that the plaintiffs had failed to produce any evidence that Tsai's ability was impaired during the time she was employed in the one day surgery unit. The court refused to consider as evidence any of the incidents that occurred before Tsai joined the one day surgery department. The court found that the only evidence offered to support the allegation that Tsai was impaired was evidence of the Tsai-Seery fight, and evidence of the two incidents mentioned by Guckian. The two incidents were investigated by hospital staff and determined to be unrelated to any impairment due to drug use, and Guckian conceded that they were matters of judgment. The dispute with Tsai was investigated by Kitahata after Guckian himself took no action. Kitahata found that the cause of this incident could not be determined.

The plaintiffs' complaints were virtually identical and each alleged that "the plaintiff became aware that one of the anesthesiologists employed in the One-Day Surgery Department had a history of serious drug abuse and showed signs of volatile behavior consistent with the *continued* abuse. It became increasingly apparent to the Plaintiff that this drug problem had the potential to greatly hinder and *did in fact* hinder ability to

days, and the board or any individual may, file a petition when such society, physician or hospital or said board or individual has any information which appears to show that a physician is or may be unable to practice medicine with reasonable skill or safety for any of the reasons listed in section 20-13c. Petitions shall be filed with the department of health services on forms supplied by the department, shall be signed and sworn and shall set forth in detail the matters complained of.

"(b) Any health care facility licensed under section 19a-493 which terminates or restricts the staff membership or privileges or any physician shall, not later than fifteen days after the effective date of such action, notify the department of such action."

perform duties as an anesthesiologist and it was becoming unsafe for said doctor to continue performing said duties unless under the constant scrutiny of other professionals on the staff. Hence, said doctor's presence in the Department seriously undermined the effectiveness and efficiency of the Department . . . . '' (Emphasis added.)

We agree with the trial court that the complaint alleged that Tsai was impaired sometime during the period from July, 1981, when Tsai was assigned to the one day surgery unit, to March, 1982, and that the defendants had violated public policy by failing to report that impairment pursuant to General Statutes § 20-13d. The plaintiffs did not allege that the hospital had violated any other public policy.

" 'The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. *Board of Education* v. *Commission on Human Rights & Opportunities,* 177 Conn. 75, 77, 411 A.2d 40 (1979); *Lundberg* v. *Kovacs,* 172 Conn. 229, 232, 374 A.2d 201 (1977). It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations in his complaint. *Kawasaki Kisen Kaisha, Ltd.* v. *Indomar, Ltd.,* 173 Conn. 269, 272, 377 A.2d 316 (1977); *Strimiska* v. *Yates,* 158 Conn. 179, 185, 257 A.2d 814 (1969); *Nash Engineering Co.* v. *Norwalk,* 137 Conn. 235, 239, 75 A.2d 496 (1950). "A plaintiff may not allege one cause of action and recover upon another. Facts found but not averred cannot be made the basis for a recovery." *Malone* v. *Steinberg,* 138 Conn. 718, 721, 89 A.2d 213 (1952); *Schaller* v. *Roadside Inn, Inc.,* 154 Conn. 61, 65, 221 A.2d 263 (1966).' *Francis* v. *Hollauer,* 1 Conn. App. 693, 694–95, 475 A.2d 326 (1984)." *Savin* v. *National Personal Consultants, Inc.,* 4 Conn. App. 563, 566–67, 495 A.2d 1109 (1985).

The plaintiffs were bound by the allegations of their complaint to prove that Tsai was impaired during the time she worked with Seery on the one day surgery unit. Stripped of the earlier Tsai episodes, the evidence that remained before the jury consisted of only the two incidents mentioned by Guckian, and the fight. Guckian's testimony made it clear that he did not consider Tsai to be incompetent. Even if the jury might have accepted the claim that the plaintiffs were discharged, they could not reasonably and legally have concluded from this evidence that Tsai was impaired at the time of the discharges. We agree with the trial court that "because there was no credible evidence that the physician in question was impaired, during the time period pleaded," the defendants were not guilty of violating public policy. Although under *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, the violation of public policy does not depend upon a statutory violation, the plaintiffs directed the trial court to no other public policy violations. In the absence of a public policy violation, there is no cause of action under *Sheets*. See *Morris* v. *Hartford Courant Co.*, supra, 680–81.

The trial court did not err in directing a verdict in favor of the defendants.

In light of this holding, we need not consider the plaintiffs' claim that the court erred in ruling that they were ineligible for damages for pain and suffering.

There is no error.

In this opinion the other judges concurred.