[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter was commenced by the complaint of the plaintiff Suzanne Rogers, dated November 5, 1991 with a return date of December 3, 1991. The plaintiff then filed a revised complaint dated July 22, 1992. The defendant, The Hartford Insurance Company of Connecticut filed an answer to the revised complaint dated August 14, 1992. Then on September 2, 1992 the defendant filed a revised answer and an affirmative defense to the plaintiff's revised complaint. On September 8, 1992 the plaintiff filed a reply to the defendant's affirmative defense.
This matter involves the employment of the plaintiff by the defendant and her subsequent demotion. The plaintiff alleges that the defendant did not follow their own disciplinary guidelines when they demoted her. The plaintiff alleges these guidelines require that an employee has to be given a verbal warning, a written warning and probation/final warning before said employee can be dismissed or given a change in position. The defendant denies these allegations and in effect say that the plaintiff was an "employee at will" and that either the plaintiff could quit the defendant's employ at any time or the defendant could terminate the plaintiff's employment at any time and in either event, neither party would have recourse against the other.
The plaintiff is a college graduate who was hired by the defendant on December 27, 1985 as a Member Services Trainee commencing January 13, 1986 (Exhibit A). She worked in the Homeowners Department as a Customer Service Representative Trainee for about six to eight months and then became an Associate Customer Service Representative. In November, 1987 the plaintiff was promoted to the position of Supervisor where CT Page 3096 she was in charge of twelve individuals. Her unit was involved with Homeowners Policies. The plaintiff worked in the "Personnel Lines Insurance Center (hereinafter PLIC) division of the defendant. This division was specially created to deal with insurance needs of the members of the "America Association of Retired People" (hereinafter AARP). The employees in this unit were trained to deal with the needs of older individuals and were paid a very competitive salary for their work according to Philip Kenyon, an employee of the defendant.
The testimony of Ann Higgins, Diane Studer and Valentina Walder who were all the plaintiff's superiors at one time or another was that she was a good employee in each position where she worked under them and always met or exceeded the goals established for her position. (See Exhibits I, O, P). Only one time in her years with the defendant was the plaintiff reprimanded or spoken to by her superior relative to her job performance. That had to do with her attendance and the superior involved was Valentina Walder (See Exhibit H). The plaintiff's initial salary was $307.70 per week and rose to an annual salary of $32,300.00 when she left the defendant's employment in November, 1989.
According to the testimony of Carolyn Zwaga, the plaintiff's superior in 1989, it came to her attention in the fall of that year that there were problems in the plaintiff's job performance. Ms. Zwaga was the Customer Relation Manager at the PLIC and as such the plaintiff's immediate superior. These problems involved an employee complaint and complaints from insureds of the defendant by the names of Miller, Hoffenberg and Weisbrodt. These complaints will be discussed individually.
Sometime in 1989 the PLIC held a jailathon with all proceeds going to a charity. Ms. Zwaga and Mr. Kenyon both testified that they saw the plaintiff participating and that she was in jail "for failure to make her supervisor callbacks." By that was meant that when an insured is not satisfied with answers they receive from a Customer Service Representative, they will ask to speak to a supervisor. The Customer Service Representative gives this request to their supervisor and the supervisor is expected to expeditiously call the insured. Ms. Zwaga particularly stated she was surprised by the reason for the plaintiff being in jail during the jailathon. She did nothing about it but made a note of it for future reference. CT Page 3097
In late September, 1989 Ms. Zwaga stated Hugh Martin, an executive vice-president of the defendant and Paula Schantziss of the AARP visited her about a complaint of a Dalbert Miller. Mr. Miller, a member of the AARP, was insured with the defendant and requested some rental property he owned be removed from his insurance coverage and as a result his entire policy was cancelled and he was without insurance. He alleged that the plaintiff was rude to him on the telephone and was not helping him with this problem. As a result of his complaint, Ms. Zwaga wrote him a letter of apology on October 9, 1989 (Exhibit 17). The plaintiff testified that when Carolyn Zwaga spoke to her about Mr. Miller's complaint, she said not to worry about it as he is mad at the company (defendant) and just taking it out on you (plaintiff).
Another matter involved Milton and Frances H. Huffenberg (Exhibits 11, 12 and 13). They were upset because they were issued an insurance policy but the proper schedule to insure furs, jewelry etc. was not included. Ms. Zwaga testified there were four calls from the insured to speak to the plaintiff and she did make return calls to the insured. Then it appeared that the plaintiff referred the matter to Sue Condron in the sales department. Ms. Zwaga stated the defendant had a customer (Huffenbergs) that did not have the coverage they needed and they were frustrated. She felt if the plaintiff had done her job, made the callbacks to the insured and saw that the insurance coverage was corrected that there would not have been a problem. The plaintiff testified that Mr. Mrs. Huffenberg could have asked for a supervisor and that is why her name appears on Exhibit 11. The plaintiff said she sent word to Sue Condron to call the plaintiff.
The next matter involves Beverly Weisbrodt (Exhibits 14, 15 and 16). The plaintiff testified that she received a message from a customer service representative to call this insured regarding a reinstatement of an insurance policy. This policy was cancelled for the third time for non-payment effective September 10, 1989. The plaintiff called the insured and the insured said the policy was cancelled and she wanted it reinstated. The plaintiff decided to look into the matter further. She testified she called for the insured's records. After she received these records she called the accounting department and found that the insured had paid her insurance premium but that through a defendant's error the monies were applied to the wrong policy. The plaintiff then testified she CT Page 3098 then checked the Guidelines for Reinstatement. After reviewing those guidelines, she referred the matter to an underwriter because she felt the policy should be reinstated. Miss Rogers testified that the underwriter instructed her to reinstate the policy and she did provided payment was received within ten days (Exhibit 15). The plaintiff testified that the underwriter who authorized the reinstatement was Deborah Proto. She said the reinstatement was done in accordance to the Reinstatement Guidelines for Homeowners Policies (Exhibit 6). The plaintiff stated that while working for the defendant she reinstated at least one thousand policies. Deborah Proto testified she had been an underwriter with the plaintiff since 1984 and that she had worked with the plaintiff and was friendly with her. She testified she remembers orally authorizing the plaintiff to reinstate a policy two or three months before she (plaintiff) left the defendant's employment. She stated it was a file where the customer had been reinstated in the past and that a consensus was reached that it was cancelled because of company error and it was decided to reinstate the policy. Ms. Proto stated she remembered looking over the plaintiff's shoulder and discussing it. She further stated that at that time if a policy had been cancelled for non-payment more than one time, the defendant would not be reinstated. When Ms. Proto was shown Exhibits 14 and 15 she did not remember them except on Exhibit 15 the statement "OK to reinst if pymt received w/in 10 days" was familiar to her. Ms. Proto did not remember the name Weisbrodt or the name of the policy she authorized the plaintiff to reinstate. She stated she did not go to the underwriter that had ordered the policy not to be reinstated and that would have made sense to do. She also testified that on Exhibit 14 there is no indication of company error. Carolyn Zwaga testified that the Weisbrodt policy was cancelled three times for non-payment and that there were three calls that were not returned to the insured by the plaintiff. Also, she stated the last three and one-half (3-1/2) lines on Exhibit 14 were deleted and replaced by two and one-half (2-1/2) lines on Exhibit 15. She testified the significance of this was that there was now no record that the insured called many times and the calls were given to the plaintiff and that the insured was upset. Ms. Zwaga testified that she believed the plaintiff deliberately deleted information from the insured's file, reinstated the policy without authority and did not return her phone calls. She testified it appeared to her that the plaintiff was deceitful.
Dawn Duff testified that she had worked for the defendant CT Page 3099 since January, 1987 and was a Customer Service Representative with the plaintiff. She now has the position of Consultant for the defendant. In May, 1989 the plaintiff became Ms. Duff's supervisor. Ms. Duff stated she went to Renee Anderson in the defendant's Personnel Department to complain about the fact that the plaintiff did not have the required information at her desk that a supervisor needs to assist her customer service representatives, was ineffective as a supervisor and did not support or make herself available to her unit employees. After she met with Renee Anderson, she then made the same complaints to Carolyn Zwaga. There was testimony which indicated Ms. Duff and the plaintiff did not get along. The complaint of Dawn Duff to Ms. Zwaga was made on November 8, 1989.
In early November, 1989 Carolyn Zwaga went to Philip Kenyon who was the Director of Customer Service for the defendant and her immediate supervisor and stated that there were a few matters concerning the plaintiff that she felt needed to be investigated. Ms. Zwaga instructed Valentina Walder to check on some of the plaintiff's actions and report those findings to her. This was done in a short period of time. Mr. Kenyon testified that the defendant had increased the rates for the AARP and the members were upset so service of the AARP's needs became very important. He stated in the second quarter of 1989 the word was put out that the AARP were upset about the defendant's supervisor callback process.
After Ms. Walder completed her investigation of the plaintiff, she reported her findings to Ms. Zwaga. Ms. Zwaga recommended to Philip Kenyon that the plaintiff be removed from her position as supervisor for the following reasons:
1. Failure to document the reinstatement authority of the Beverly Weisbrodt policy and for her intentional erasure of information in this file.
2. Failure to make her callbacks to customers.
3. Her handling of the Hoffenberg matter.
4. Her handling of the Dalbert Miller matter.
5. The allegations of Dawn Duff who worked for the plaintiff and who complained about her. CT Page 3100
On November 9, 1989 Philip Kenyon, Renee Anderson of the Personnel Department and Carolyn Zwaga met with the plaintiff and discussed the matters set forth above with her. According to Ms. Zwaga and Mr. Kenyon, the plaintiff said "words to the effect", "I always make my callbacks or I have my reps do it for developmental purposes. It looks like I'm not doing my job but anyone who knows me knows that is not true." At this meeting according to Ms. Zwaga's testimony, Mr. Kenyon explained to the plaintiff that she could remain in her position as supervisor, she could be moved to another position or she could be separated (terminated as an employee). This was done after the plaintiff asked Mr. Kenyon if he was going to fire her. This meeting on November 9, 1989 lasted about thirty (30) minutes at the end of which Mr. Kenyon told the plaintiff to get her things out of her desk and report back to him at 9:00 a.m. the next day. Mr. Kenyon testified he had formed no opinion about the plaintiff until after the aforesaid meeting on November 9, 1989. After that meeting he felt that the plaintiff did not make her supervisor callbacks as required, that she consciously erased information from the Weisbrodt file that should not have been erased and that she reinstated that policy without authority. Ms. Zwaga who just took notes at the meeting stated she was convinced that her recommendation to remove Miss Rogers from her position was the correct one after this meeting.
Later on November 9, 1989, Ms. Zwaga testified the plaintiff called her and said she would not be back to work for the defendant. Then early on the morning of November 10, 1989 the plaintiff called the offices of the defendant and said she still wanted to meet that day with Mr. Kenyon, Ms. Anderson and Ms. Zwaga. That meeting took place that morning. Miss Rogers testified she brought with her information she had on the Weisbrodt file and which she took from her desk on November 9, 1989. (Exhibit HH1-7). She stated she presented this information to Mr. Kenyon and he pushed it aside and stated this means nothing now. Ms. Zwaga testified that nothing in Exhibit HH1-7 showed that the defendant was at fault in canceling the Weisbrodt policy either in 1985, 1986, or 1989. At this meeting Mr. Kenyon informed the plaintiff that she was going to be removed from her position as a supervisor in the Homeowner's Unit and transferred to the Automobile section as an auto trainee. Mr. Kenyon testified he told plaintiff her salary was being reduced from approximately $32,000 annually to $25,000 annually. He testified that at the time new employees were starting at a salary of $17,000 to $18,000 annually. The CT Page 3101 plaintiff did not ask Mr. Kenyon any questions about her new position. Mr. Kenyon testified that the plaintiff's past performance played a big part in his reason to demote her. He stated he could have terminated her but he felt this was a fair offer and that she would continue to grow in the organization. The plaintiff testified that she felt this demotion to the position of auto trainee forced her to leave the employment of the defendant. She testified she felt she could never be a supervisor again. The plaintiff stated it was her decision not to take the position of auto trainee and to resign from the defendant's employ. After the meeting of November 10, 1989 the plaintiff testified she went home and while there received a call from Renee Thompson who offered her two weeks severance pay if she would leave. The plaintiff said she would think about it. That was on Friday she believed. She thought about it over the weekend. On Monday she testified she called Carolyn Zwaga and told her she had decided to leave the plaintiff's employment.
At the conclusion of the plaintiff's evidence, the defendant moved for a directed verdict which the court denied.
The defendant claims that the plaintiff was an employee at will and as such could be terminated from her position of employment at any time. The plaintiff claims that the defendant's Personal Policy and Procedures Manual sets forth a progressive disciplinary method that must be followed before the defendant can terminate or demote an employee i.e. the plaintiff (Exhibit FF1-8). The plaintiff's original complaint refers to the Personal Policy and Procedures Manual as Exhibit A attached to said complaint. That Exhibit A (attached to said complaint and referred to in the plaintiff's revised complaint dated July 27, 1992) is the "PLIC Supervisory Reference Guide" which was admitted at trial as plaintiff's Exhibit FF1-8. That exhibit is dated November 1, 1989, and states that the disciplinary process is a verbal warning, written warning and Probation/Final warning method. The plaintiff alleges and the evidence shows that the plaintiff was only given one disciplinary warning in all her years of employment with the defendant. This was a warning dated January 5, 1987 and was relative to her attendance. (Exhibit H)[.] However, the plaintiff's employment application which she filled out when she applied for a job with the defendant and the PLIC Supervisory Reference Guide all had language in them that stated that the hiring of a person was not creating a contract between that person and the defendant CT Page 3102 (Exhibits 3c, 4 and FF8). The PLIC Supervisory Reference Guide states in effect that only the Chief Executive Officer or President has the power to make a contract binding on the defendant. The plaintiff testified she had no contract signed by the Chief Executive Officer or President of the defendant. In Connecticut personnel handbook provisions, if they meet the requirements for the formation of a unilateral contract, may become enforceable as part of the original employment contract. Finley v. Aetna Life Casualty Co., 5 Conn. App. 394, 410. However, whether the hiring of the plaintiff by the defendant created a contract between the parties is a question of fact to be determined by the evidence. From the evidence the court finds that the plaintiff did not sustain her burden of proof as to the allegations set forth in her complaint. The court finds that the relationship between the plaintiff and defendant was an employment terminable at the will of either party. There is no evidence that either party intended that a contract of employment existed between them. Likewise the court finds that the plaintiff Suzanne Rogers voluntarily quit her position with the defendant. The court finds that the defendant demoted the plaintiff from her position of Supervisor in the Homeowners Unit to the position of Auto Trainee in the Auto Unit. The defendant did not terminate the plaintiff. The court also finds that the defendant retained the right to discipline employees, including outright termination if the same was justified in its opinion without being bound by a progressive discipline system. There was no evidence whatsoever that the defendant treated the plaintiff any differently than any other employee. The court also finds that this demotion was not a constructive termination of the plaintiff or in effect forced her to quit her job. Constructive discharge occurs when an employer renders an employee's working condition so difficult and intolerable that a reasonable person would feel forced to resign. Seery v. Yale-New Haven Hospital, 17 Conn. App. 532, 540. A claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable that he or she was forced to resign. Ibid. Normally an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge. Through the use of constructive discharge, the law recognizes that an employee's "voluntary" resignation may be, in reality, a dismissal by the employer. Ibid. Likewise there is no public policy violation here that would take or make this matter something other than an ordinary dispute between an employee and employer. Sheets v. Teddy's CT Page 3103 Frosted Foods, Inc., 179 Conn. 471. It is true they demoted her, but they placed her in another unit than that from which she was demoted. The uncontroverted evidence was that while the plaintiff was given a substantial pay reduction, her pay was still substantially above that salary which was paid to those who held the position to which she was demoted. The court finds from the evidence that Judgment in this matter should enter for the defendant. Since the court has found the issues for the defendant, it is not necessary to discuss the plaintiff's claim for damages.
Judgment may enter accordingly.
WILLIAM J. SULLIVAN, J.