MEMORANDUM OF DECISION
GUERNSEY, Chief Judge.
Plaintiffs Second Amended Complaint seeks damages from the Mohegan Tribal Gaming Authority under The Mohegan Tribal Discriminatory Employment Practices Ordinance, MTO 2002-04. The Plaintiff claims that a hostile working environment was created by Gary Surratt, Manager of the Licensing Department, by virtue of his alleged actions in repeatedly touching his genital area in the presence of employees, including the Plaintiff. The Plaintiff also claims she was constructively discharged from her employment by reason of retaliatory measures allegedly taken against her.
The matter was tried to the Gaming Disputes Trial Court over a period of five months.
I. FINDINGS OF FACT
1. The Plaintiff Sylvia Tomsky was first hired by the Defendant in July *343 of 1999 in the area of operational accounting.
2. In February, 2000 she applied for and was hired for a position in the Licensing Department, whose manager at the time was Michael Brown.
3. The Defendant Gary Surratt became the manager of the Licensing Department on October* 1, 2001. The supervisor of the Licensing Department was Ms. Kathleen Ber-nier, who had unsuccessfully sought the manager’s position given to Mr. Surratt.
4. In the presence and view of Ms. Tomsky and others, Gary Surratt would touch his genital area, which behavior commenced shortly after his arrival in the Licensing Department.
5. This was also observed, to varying degrees, by other women working in the Licensing Department, including Kathleen Bernier, Christine Mills, Margaret Ellel, Stephanie DeLillo, and Shannon Duerr.
6. Although this behavior made her feel very uncomfortable, Ms. DeLil-lo did not file a written complaint because she feared retaliation.
7. On November 6, 2001 Kathleen Bernier filed an “Employee Incident Report” (Plaintiff’s Exhibit 8) claiming that on a daily basis she noticed Gary Surratt touching himself in improper places.
8. The behavior described in Ms. Ber-nier’s complaint was also observed by Ms. Margaret Ellel, who also found it offensive.
9. Ms. Ellel, who had been asked by Ms. Bernier to sign the complaint but refused, decided to confront Mr. Surratt directly about his behavior, which she did the next day.
10. On November 7, 2001 Sylvia Tom-sky filed an “Employee Incident Report” (Plaintiffs Exhibit 9) claiming, in part, that Gary Surratt would touch his groin area and that he was creating a very uncomfortable environment in the Department.
11. On November 7, 2001, Shannon (Blake) Duerr (now Shannon Fancher) filed an “Employee Incident Report” claiming that Gary Surratt, on a daily basis, would walk through the office and scratch and grab himself in inappropriate places, as well as other conduct that made her uncomfortable (Plaintiffs Exhibit 10).
12. The complaints were brought to the attention of Lawrence Jaeoinski, an employee counselor in the Human Resources Department, who discussed the situation with the complainants and informed them that, inasmuch as it involved a manager, it would be handled by his manager, Ms. Kathy Blake.
13. The Human Resources Department process for investigating complaints of gender discrimination or sexual harassment involves a Director of Employee Resources and Training, Tony Deniston, a Manager, Kathy Blake, and approximately seven employee counselors.
14. The matter was thereafter assigned to Ms. Laurie Keenan, an employee counselor in the Human Resources Department, who met with the complainants and others.
15. On November 8, 2001 Kevin C. Bo-gle, Vice President of Human Resources, issued a written Record of Discussion (Plaintiffs Exhibit 15a; . Defendants Exhibit 1) reciting in *344 general terms the complaints made and that Mr. Surratt was told “this behavior must immediately cease.”
16. The complainants were informed only that the issues had been addressed, without elaboration.
17. On March 7, 2002 Gary Surratt issued an Employee Commendation to the Plaintiff for outstanding performance during a review of an applicant’s Personal History Disclosure.
18. For reasons irrelevant to this case, during the period commencing approximately April 29, 2002 through July 31, 2002 the Plaintiff was not employed by the Defendant Mohegan Tribal Gaming Authority.
19. The Plaintiffs position was held during this period and she willingly returned to the Licensing Division in August, 2002.
20. On August 13, 2002, during a period of license renewal being conducted in the Uncas Grill, after the Plaintiff criticized the manner in which Ms. Sandra Smith was notarizing documents and in response to Ms. Smith’s statement that she could take it up with management, the Plaintiff declared “management sucks”.
21. This exchange upset Ms. Smith and led to a loud confrontation in the Licensing Office the next day, which resulted in a written Record of Discussion for both the Plaintiff (Defendant’s Exhibit 6) and Ms. Smith (Defendant’s Exhibit 19) on August 16, 2002.
22. On August 13, 2002 the Plaintiff filed her second written complaint against Mr. Surratt (Plaintiffs Exhibit 12), stating that there was no communication in the office, that he had created animosity among coworkers, that he did not welcome her back like other co-workers did, and created a hostile work environment with favoritism. There was no allegation in this complaint that Mr. Surratt continued the inappropriate touching of himself. The complaint recites that Plaintiff was ■warned by Ms. Bernier that she was going to be “written up”.
23. On August 14, 2002, Kathleen Ber-nier filed her second written complaint against Mr. Surratt (Plaintiffs Exhibit 11). This complaint again alleged inappropriate touching, as well as allegations concerning the way Gary Surratt spoke to young girls in the office, that on occasion he gave them back rubs, and that he failed to involve her, as Supervisor, in matters that were properly her concern.
24. Ms. Laurie Keenan met with Ms. Bernier, the Plaintiff, and Ms. Paulette Sherris concerning their complaints on or about August 22, 2002 (Plaintiffs Exhibit 13).
25. Kevin C. Bogle discussed these matters with Gary Surratt on September 17, 2002, which was memorialized in a Record of Discussion (Plaintiffs Exhibit 15b, Defendant’s Exhibit 8).
26. On October 3, 2002, in the course of a conversation with Ms. Jolene Ladd, a Licensing Coordinator who had worked in the department for three months, the Plaintiff referred to Mr. Surratt in an insulting manner, upsetting Ms. Ladd.
27. The effect on Ms. Ladd was observed by another Licensing Coordinator, Ms. Margaret Ellel, who informed Mr. Surratt. One week later, on October 10, 2002, Ms. Ladd discussed the matter with *345 Mr. Donald J. Trella, Director of Recruitment and Preference, and gave him a written statement about the incident (Defendant’s Exhibit 9).
28. The matter was turned over to Ms. Kathy Blake for investigation, who met with the Plaintiff on October 11, 2002. During the course of the conversation the Plaintiff admitted that the offensive touching had ceased, but maintained that Gary Surratt should have lost his job as a result of his actions, that she feared it would happen again, and that he promotes favoritism in the office.
29. Following the meeting with Ms. Blake, the Plaintiff called Ms. Ber-nier and submitted a verbal resignation, followed the same day by a written letter of resignation. (Plaintiffs Exhibit 22).
II. DISCUSSION
The instant case is the first to be tried to conclusion under the Mohegan Tribal Discriminatory Employment Practices Ordinance, MTO 2002-04.[1] Plaintiffs claims are brought under MTO 2002-04 §§ 104 and 106, and allege gender discrimination[2] and retaliatory action[3]. In support of her claims, Plaintiff urges this Court to adopt case law interpreting Title VII of the Civil Rights Act of 1964[4]. Addressing the fact that the Plaintiff resigned, the Plaintiff claims she was forced to resign, essentially arguing that she was constructively discharged.
At the outset, although not raised by either party, the issue of the extent of the limited waiver of sovereign immunity contained in MTO 2002-02 must be addressed. Section 109 of MTO 2002-04 makes it clear that the waiver of sovereign immunity in the Ordinance is quite limited:
Nothing in this Ordinance waives the sovereign immunity of Tribe or the Mohegan Tribal Gaming Authority except to the limited extent and for the limited purposes expressly set forth in § 108 of this Ordinance.
Although silent on the issue of the applicability of case law interpreting other discriminatory employment practice legislation, the Ordinance is quite specific that such other legislation has no applicability to the Mohegan Tribe and the Mohegan Tribal Gaming Authority:
(1) By adoption of this Ordinance, The Mohegan Tribe and The Mohegan Tribal Gaming Authority (“MTGA”) does not consent to the applicability of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, or the American[s] [with] *346 Disabilities Act enacted by the Congress of the United States, or to any other federal law or regulation that does not expressly apply to Indian tribes and their members, or to any State law or regulation.
MTO 2002-04 § 102(C)(1).
As to Plaintiffs claim that the actions of Gary Surratt brought about a hostile work environment, the initial inquiry must be whether such conduct, if proved, is made actionable under the provisions of MTO 2002-04. The basis for such a claim, under federal law, is found in Title VII of the Civil Rights Act of 1964, and has been described by the United States Supreme Court as follows:
Title VII of the Civil Rights Aet of 1984 makes it “an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). As we made clear in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), this language “is not limited to ‘economic’ or ‘tangible’ discrimination. The phrase ‘terms, conditions, or privileges’ of employment ‘evinces a congressional’ intent ‘to strike at the entire spectrum of disparate treatment of men and women’ in employment,’ ” which includes requiring people to work in a dis-eriminatorily hostile or abusive environment. [citations omitted]. When the workplace is permeated with “discriminatory intimidation, ridicule, and insult,” 477 U.S. at 65, 106 S.Ct. 2399, that is “sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment,” [citations omitted] Title VII is violated.
Harris v. Forklift Systems, Inc. 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).
Similarly, Connecticut law also prohibits discrimination in the following areas:
(a) it shall be a discriminatory practice in violation of this section:
(1) For an employer ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment .. .
Conn. Gen.Stat. § 46a-60(a)(l).
By contrast, the Mohegan Tribal Discriminatory Employment Practices Ordinance prohibits discrimination only in the following areas:
It shall be an unlawful employment practice for an Employer to discriminate, with respect to hiring, discharging, compensation, benefits, demotion, disciplining, suspending, barring, or layoff, on account of an Individual’s ... gender
[[Image here]]
MTO 2002-04 § 104. An issue of first impression is therefore presented as to whether the elimination of the phrase “terms, conditions, or privileges of employment” is intentional and therefore serves as a limitation on the waiver of sovereign immunity set forth in MTO 2002-04 § 109.
“A statute should be read as a whole and interpreted so as to give effect to all of its provisions.” Pintavalle v. Valkanos, 216 Conn. 412, 418, 581 A.2d 1050 (1990). In the case of the Mohegan Tribal Discriminatory Employment Practices Ordinance, the limited waiver of sovereign immunity is expressly tied to the provisions of § 108 of the Ordinance. As to remedies, this section is quite specific and limited:
*347 (a) If the Court finds the Complaint is supported by a preponderance of the evidence, it may order the following remedies only: (i) One (1) year of lost wages, which the Individual has a duty to mitigate; (ii) Attorney’s fee that shall not exceed one-third of the lost wage award; and/or (iii) Reinstatement or in-statement of the Individual, either into the position that is the subject of the litigation or into a comparable position that the Individual is qualified to hold of equivalent status, wages and benefits, as determined by the Court.
(b) The remedies specifically enumerated within this section shall be the sole and exclusive remedies.
MTO 2002-04 § 108(D)(2).
What is notable about the remedies which the Court is permitted to award is that, by their very terms, they can apply only to cases in which the discriminatory practice resulted in lost (or reduced) wages, the loss of an employment position, or a failure to hire. The Gaming Disputes Court, by the express terms of the Ordinance, is deprived of the authority to award any other type of general damages, such as might result from being subjected to a hostile work environment, unless the same led to a loss of wages or the loss of an employment position.
Read in conjunction with § 104, this limitation on damages is consistent with the prohibition in that section against discrimination with respect to “hiring, discharging, compensation, benefits, demotion, disciplining, suspending, barring, or layoff”, all of which would, or at least potentially could, lead to the loss of (or reduced) wages or the loss of an employment position.
As the Gaming Disputes Court of Appeals has recently emphasized,
“[T]he substantive law of The Mohegan Tribe is ... careful to preserve the Tribe’s sovereign immunity, as well as the requirement that any waiver thereof must be unequivocally expressed and cannot be implied.” [citations omitted] “Statutes in derogation of sovereign immunity must be strictly construed. In order for the sovereign to be sued without its consent, there must be a clear intention by the [Tribal Council] through the use of express terms, [citations omitted]”.
MacLean v. Office of the Director of Regulation, 1 G.D.A.P. 20, 5 Am. Tribal Law 273, 2004 WL 5659257 (2004), quoting Bethel v. Mohegan Tribal Gaming Authority, Et Al., 1 G.D.A.P. 1, 4, 2 Am. Tribal Law 373, 2000 WL 35733912 (2000).
The effect of the elimination from MTO 2002-04 of the phrase “terms, conditions or privileges of employment” and the insertion of the restrictions contained in § 104[5] are striking in this case. The Plaintiff has certainly produced a prima facie ease that she, and other women in the Licensing Department, were subjected to “a sexually objectionable environment ... both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so ... ” Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998). That the conduct of Gary Surratt was objectively offensive was confirmed by *348 the testimony of fiveMr. Chloris LOWE, Jr., Enrollment # 439A001593; Mr. Stewart J. Miller, Enrollment # 439A002566, Plaintiffs, v. Ho-Chunk Nation Legislature Members Elliot GARVIN, Gerald Cleveland, Myrna Thompson, Dallas White Wing, and Clarence Pettibone, in their official capacity and individually; and Ho-Chunk Nation Election Board, Defendants[6] women in the Department; that is was found to be subjectively so by the Plaintiff is beyond any doubt.[7]
However, in terms of connecting this conduct to a loss recognized by MTO 2002-04 § 108, the Plaintiff has not sustained her burden of proof as to the elements of a constructive discharge:
“Constructive discharge occurs when an employer renders an employee’s working conditions so difficult and intolerable that a reasonable person would feel forced to resign.” Neale v. Dillon, 534 F.Supp. 1381, 1390, aff'd, 714 F.2d 116 (2d Cir.1982). See generally, annot., Constructive Discharge—Title VII, 55 A.L.R. Fed. 418. A claim of constructive discharge must be supported by more than the employee’s subjective opinion that the job conditions have become so intolerable that he or she was forced to resign. Neale v. Dillon, supra; Beye v. Bureau of National Affairs, 59 Md.App. 642, 649, 477 A.2d 1197, 1201 (1984). “Normally, an employee who resigns is not regarded as having been discharged, and thus would have no right of action for abusive discharge.” Beye v. Bureau of National Affairs, supra,. Through the use of constructive discharge, the law recognizes that an employee’s “voluntary” resignation may be, in reality, a dismissal by the employer.
Seery v. Yale-New Haven Hospital, 17 Conn.App. 532, 540, 554 A.2d 757 (1989).
The evidence establishes that the offensive conduct on the part of Mr. Surratt took place between October 1, 2001 and approximately November 8, 2001.[8] After her written complaint and the ensuing investigation thereof, the Plaintiff continued as a Licensing Coordinator (even receiving a commendation from Mr. Surratt on March 7, 2002) until approximately April 29, 2002, when for reasons unrelated to her conditions of employment or this case, her employment by The Mohegan Tribal Gaming Authority was suspended. This suspension lasted until approximately July 31, 2002, after which she returned to the Licensing Department. It is noteworthy that her position was held for her during this period.
The Plaintiff returned to work in August, 2002, and promptly was involved in an incident in which her criticism of management led to a loud confrontation with another employee of the Licensing Department, resulting in both employees receiving a Record of Discussion. After the incident, but before receiving the Record of Discussion, the Plaintiff filed her second written complaint against Mr. Surratt, motivated in part by the anticipation (based on a warning by Ms. Bernier) that she would be “written up”. This second complaint contained no allegation of continued inappropriate touching, but rather com *349 plained of a lack of communication in the office, that Mr. Surratt has created animosity among coworkers, that he did not welcome the Plaintiff back as did other coworkers, and that he created a hostile work environment by practicing favoritism.
The next day Ms. Bernier filed her second complaint against Mr. Surratt, which did contain the allegation of inappropriate touching. This is the only written allegation that this type of behavior continued beyond November, 2001, and is inconsistent with the testimony of Margaret Ellel and Shannon Duerr[9]. Based on this, and the statements made by the Plaintiff to Kathy Blake during the October 11, 2002 interview, the Court finds that the Plaintiff has failed to establish by a preponderance of the evidence that Mr. Surratt’s inappropriate touching continued substantially beyond November, 2001.[10]
In early October, 2002, during a conversation with Ms. Jolene Ladd, the Plaintiff proceeded to interject her extremely negative opinion of Mr. Surratt,[11] which was sufficiently upsetting to Ms. Ladd that she mentioned it to Ms. Margaret Ellel. It was subsequently reported to Mr. Surratt and then to Mr. Donald Trella, who spoke to Ms. Ladd about the incident and obtained from her a written statement (Defendant’s Exhibit 9).
The matter was turned over to Ms. Kathy Blake for investigation, and on October 11, 2002 she met with the Plaintiff. During this interview, the Plaintiff denied using the specific words that had been attributed to her, but complained that Mr. Surratt had favorites and that he had sexually harassed persons in the Department by touching his crotch. When asked if the behavior had continued, she stated that it had not, but that she feared it would happen again. The Plaintiff made clear her dissatisfaction with the outcome of the investigation into Mr. Surratt’s behavior, and that she wanted him removed from his position.
Ms. Blake’s second e-mail description of the interview, dated November 13, 2002, addressed to Tony Denniston, indicated that the Plaintiff became tearful and stated that she had had enough and was going to resign. The Plaintiffs testimony, however, indicated that she was uncertain following the meeting about whether or not to resign, but that following a call to her husband and his attorney, she called Ms. Bernier and resigned.
That the Plaintiff was extremely offended by the conduct of Gary Surratt in October and November, 2001 is beyond question, as is the fact that she considered the handling of the matter by the Department of Human Resources to be inadequate and the action against Mr. Surratt nothing more than a slap on the wrist. Thereafter she appears to have made little attempt to disguise her opinions concerning him and *350 her view that he should have been dismissed.[12]
Viewed in the context of her employment situation, however, this fails to establish that the conditions were “so difficult and intolerable that a reasonable person would feel forced to resign.” Seery v. Yale-New Haven Hospital, 17 Conn.App. 532, 540, 554 A.2d 757 (1989). The documents and testimony introduced at trial, viewed in their entirety, fall short of establishing by a preponderance of the evidence that Mr. Surratt’s offensive touching of himself continued after the initial Human Resources intervention following the November, 2001 complaints.[13] There was no evidence introduced that any complaints of this nature were filed by coworkers during the period of Plaintiffs suspension from April 29, 2002 through July 31, 2002. During this period, the Plaintiffs position was held open for her. Upon Plaintiffs return in August, 2002, she was involved in two incidents, the first of which resulted in a Record of Discussion and the second of which had progressed only to the investigation stage when Plaintiff resigned. Both of these incidents were based on the Plaintiffs expression to co-workers of her extremely negative opinion of Mr. Surratt.
Also of note is the fact that, despite the previous observation of Mr. Surratt’s behavior by at least six women [14], there is no evidence that anyone else felt compelled to resign. The Court accepts that the Plaintiff honestly felt that she “would be compromising [her] moral and ethical standards by continuing to work under these conditions”, (Plaintiffs Exhibit 22), but her subjective belief that the Department manager should have lost his job over the November complaints [15] does not establish the elements of a constructive discharge eleven months later.
As to Plaintiffs claim of retaliation, the Plaintiff has not satisfied her initial burden of proving by a preponderance of the evidence that the Defendant retaliated against her for filing a complaint[16] relating to MTO 2002-04.[17] Again, the evidence *351 established that subsequent to the filing of her complaint in November, 2001, the Plaintiff received a commendation from Gary Surratt. During the period of approximately one hundred days while the Plaintiff was not eligible to work, the Defendant held open her position, to which she returned as soon as she was eligible. Thereafter, the first disciplinary incident in August, 2002, arising out of a confrontation following Plaintiffs expression of her negative view of management, resulted in a Record of Discussion for both Plaintiff and the other employee, hardly indicative of retaliatory discrimination. The second, in October, was still in the investigative stage when Plaintiff resigned.[18]
Therefore, although the evidence produced at trial conceivably could establish that the Plaintiff and others, during October and the first part of November, 2001, were subjected to a hostile work environment, the Plaintiff has failed to prove any loss of income or employment as a result. The limited waiver of sovereign immunity set forth in MTO 2002-04 §§ 109 and 108(D)(2) does not allow this Court to award damages in this situation.
Judgment may enter for the Defendant.

. This Ordinance replaced the Mohegan Tribal Gaming Authority Discriminatory Employment Practices Claims and Appeals Ordinance, MTO 98-2 and was effective August 14, 2002.

. MTO 2002-04 § 104 provides as follows:
It shall be an unlawful employment practice for an Employer to discriminate, with respect to hiring, discharging, compensation, benefits, demotion, disciplining, suspending, barring, or layoff, on account of an Individual’s:
(A) race, gender, color, national origin, pregnancy or related medical condition, age, ancestry, marital status, sexual orientation, or military status;

. MTO 2002-04 § 106 provides:
An Employer is prohibited to discharge or in any other manner discriminate against an employee as a result of such employee’s filing of a complaint relating to this Ordinance or as a result that the employee testified or is about to testify in a proceeding related to this Ordinance.

. 42 U.S.C. § 2000e-2(a)(l),

. By contrast, in Perry v. Ethan Allen, Inc., 115 F.3d 143 (2d Cir.1997) the Second Circuit analyzed in the same manner a claim of hostile environment sexual harassment under both Title VII and the Vermont Fair Employment Practices Act, finding the same requirements under each. The Vermont statute, 21 V.S.V. § 495, makes it unlawful for any employer “to discriminate” against any person, without any qualification or limitation of the areas in which the discrimination might occur.

. One witness, Ms. Christine Mills, testified that she observed Mr. Surratt "adjust himself" on perhaps three occasions, but did not find it objectionable. The witness was unclear as to the time when this occurred.

. The Plaintiffs testimony clearly establishes that she never forgave Mr. Surratt for his behavior, and felt that he should have lost his job as a result, but rather only received a slap on the wrist.

.The Court's holding with respect to the limitations of the waiver of sovereign immunity in MTO 2002-04 to cases resulting in some form of economic loss or loss of employment, coupled with the failure of the Plaintiff to establish the elements of constructive discharge or other loss of wages to which the Ordinance applies, makes an examination of the reasonableness of the Defendant’s attempts to stop the offending behavior unnecessary. Brittell v. Department of Correction, 247 Conn. 148, 167, 717 A.2d 1254 (1998).

. Ms. Duerr, who testified that Mr. Surratt’s behavior made her "very uncomfortable”, had been one of the original three complainants in November, 2001.

. Ms. Stephanie DeLillo, who had observed the offensive behavior and reported it to Ms. Bernier, her supervisor, but declined to file a written complaint out of fear of retaliation, was never asked by either party if the behavior continued, and in any event was discharged for reasons related to attendance in February, 2002. Ms. Jolene Ladd, who began work in the Licensing Department in July, 2002, testified that she never observed this offensive behavior.

.The Plaintiff interrupted Ms. Ladd to tell her that Gary was "an asshole”, that "she had no respect for him as a manager", that she and others had filed a sexual harassment complaint against him but nothing was done about it, and that he was just spoken to about it.,

. The Court is not in a position to judge the wisdom of the Human Resources Department in keeping its handling of the complaints confidential. Nevertheless, the frustration on the part of the complainants, who were kept in the dark, is certainly understandable.

. The Plaintiff admitted in her testimony that she told Ms. Kathy Blake that the conduct by Mr. Surratt about which she had complained had stopped, but that she was concerned by “other types of conduct". Transcript of Testimony of Sylvia Tomsky, at 51. The Plaintiff thereafter stated that "it continued and it made all the girls uncomfortable”, Transcript at 52, leaving undefined just what was the behavior that had stopped, since the prior statement clearly referred to sexual harassment.

. Paulette Sherris, who had discussed the situation with Human Resources, had apparently not observed this behavior, and was not called to testily.

. The Plaintiff’s continued belief and repeated assertions to the effect that Mr. Surratt received only a “slap on the wrist", from her point of view, are not at all inaccurate.

. The Court declines to adopt the Defendant's position that MTO § 106, which prohibits discrimination against an employee for "filing a complaint relating to this Ordinance”, prohibits only discrimination against employees who have filed civil actions under MTO 2002-04. This extremely narrow reading of the phrase "complaint relating to this Ordinance” is inconsistent with the provisions of § 108, entitled “Complaint Process”, which provides for the use of both Human Resources processes and the filing of a civil action in the appropriate Mohegan Court. It is dear that discrimination against an employee for utilizing either approach is prohibited.

. Although MTO 2002-04 § 108(C) merely specifies that the Plaintiff has the burden of proving a Complaint by a preponderance of the evidence, in cases arising under Conn. Gen.Stat. § 31-290a (discrimination for the *351 filing of a workers compensation claim, also prohibited by MTO 2002-04 § 104(C)), the Connecticut Supreme Court has adopted the basic allocation of burdens and the order of presentation of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Ford v. Blue Cross & Blue Shield of Connecticut, Inc,, 216 Conn. 40, 53-54, 578 A.2d 1054 (1990). See also Barrett v. Hebrew Home and Hospital, Inc., 73 Conn.App. 327, 333-334, 807 A.2d 1075 (2002).

. The Plaintiff has admitted in her testimony that Ms. Blake treated her fairly during this investigation, and that she stated “we don't want you to resign.” Transcript of Testimony of Sylvia Tomsky, at 53.