Charles H. ADAIR

v.

PFIZER, INC.

No. CIV.A. 300CV1260SRU.

United States District Court,
D. Connecticut.

Feb. 6, 2003.

Robert M. Singer, Hamden, CT, Peter Burgoyne Prestley, Craig Thomas Dickinson, Madsen & Prestley, Hartford, CT, Nicholas M. Mancini, Stockton, NJ, Jacques J. Parenteau, Bradley A. Sherman, Madsen, Prestley & Parenteau, New London, CT, for Plaintiff.

James M. Sconzo, Halloran & Sage, Hartford, CT, John M. Newman, Porzio, Bromberg & Newman, Morristown, NJ, Vito A. Gagliardi, Porzio, Bromberg & Newman, Morristown, NJ, for Defendant.

## RULING ON MOTION FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

Charles H. Adair ("Adair") sued Pfizer, Inc., claiming breach of an alleged consulting contract between the parties, as well as claims premised on theories of promissory estoppel and negligent misrepresentation. Adair alleges that Pfizer eliminated his job responsibilities, effectively terminating his relationship with Pfizer, and failed to comply with the notice and termination payment provisions of the alleged contract. Pfizer has moved for summary judgment, arguing that the parties never formed a contract, and that, even if a contract was formed, Adair voluntarily left Pfizer without his position being terminated.

*Background*

In the summer of 1998, Pfizer approached Adair about a possible position with the company in the field of leadership development and succession planning. The parties entered into negotiations in November 1998. From November 1998 through January 1999, the parties exchanged drafts of an agreement. All of the drafts provided that Adair would be hired as an independent consultant working on a succession planning and leadership development process and program, would work a reduced work week, and would be paid $150,000 per annum plus a $10,000 living expense stipend. Later drafts indicated that, in the event of a "partial reduction without cause" of Adair's role in the leadership development project, "substitute new work" would be provided under a new or amended agreement. All drafts also included a section on termination. In January 1999, while the parties continued to exchange drafts, Adair moved from New Jersey to Groton, Connecticut and presented himself for work on January 4.

During the week of January 25, Pfizer held a large management meeting in Scottsdale, Arizona. Adair attended the meeting, as did Pfizer's newly appointed Vice President for Employee Resources, Donald Nelson. At the meeting, Nelson announced that Nelson would be leading the effort to develop and implement a leadership development and succession plan for the company. Adair understood those duties to be within the ambit of his position. Consequently, Adair left the meeting concerned that his job responsibilities were being eliminated. Adair voiced his concerns to Fred Zigler, Nelson's predecessor, to Nelson and to Sherrie McCool, Pfizer's Director of Organizational Effec-

tiveness for the Central Research Division. On February 8, 1999, Adair met with Nelson and McCool in Groton. Nelson and McCool encouraged Adair to remain at Pfizer. Adair, however, tendered his resignation. Consistent with the draft contract's provision governing termination of the contract by Adair, Pfizer provided Adair with one month's compensation and reimbursed him for the cost of terminating his lease. Approximately one year later, Adair filed this lawsuit.

DISCUSSION

*Standard of Review*

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not

rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 247–48, 106 S.Ct. 2505. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. 2505.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. In such a situation, "there can be 'no genuine issue as to any material fact,' since a com-

plete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548; *accord, Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (movant's burden satisfied by showing if it can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

*Contract Formation*

■ "To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. If the minds of the parties have not truly met, no enforceable contract exists." *L & R Realty v. Connecticut Nat'l Bank,* 53 Conn.App. 524, 534–35, 732 A.2d 181 (1999) (internal citations and quotations omitted). In addition, to be valid under Connecticut law, an agreement must be definite and certain in its terms and requirements. "So long as any essential matters are left open for further consideration, the contract is not complete. Essential or material terms in a contract involving an employment relationship include, duration, compensation and the employee's duties."[1] *See Grossman v. Computer Curriculum Corp.,* 131 F.Supp.2d 299, 308 (D.Conn.2000) (essential terms of an employment contract include "terms regarding the duration and conditions of the

plaintiff's employment, and [his] salary and fringe benefits.").

■ Pfizer attaches seven drafts of the agreement between Adair and Pfizer to its motion for summary judgment. Exhibits N–T. These drafts date from December 7, 1998 through January 20, 1999, after Adair had started work in Groton. Several of the drafts have handwritten notes in the margin, crossed out sections, bolded sections and italicized sections. Three copies are signed by a Pfizer representative and await Adair's signature. Exhibits O through Q.

Adair contends that these drafts demonstrate that the parties reached an agreement on the material terms of a contract and that, after Adair had already started to perform under the contract, Pfizer significantly altered, and thereby eliminated, Adair's duties. Pfizer counters that the parties never formed a contract because the parties never reached an agreement on such "essential matters" as Adair's work schedule and job description. These terms remained under negotiation in January 1999. Furthermore, by refusing to sign the contract, Pfizer asserts, Adair never accepted Pfizer's offer, and at no time did Pfizer ever explicitly accept Adair's counter-offers.

Although it is unclear which of these documents represent Pfizer's offers and Adair's counter-offers, several of the material terms remain constant throughout the different versions. *See* McCool Depo. at 114–17. The consulting arrangement was to last for three years and Adair would be paid $150,000 in annual compensation, with the possibility of a bonus. Pfizer would provide a $10,000 living expense stipend to

---

1. Although the claimed relationship of Adair to Pfizer was one of an independent contractor or consultant, rather than an employee, the type of services Adair was to provide were similar to those of an employee and thus, for

a contract to be formed, the contract required the same essential or material terms that would be found in a valid employment contract.

alleviate the cost of Adair maintaining two households. Exhibits N–T. Further, in the event that Adair was terminated without cause, he would receive the lesser of either his base annual fee, or the amount due on his contract. Exhibits N–T. In the event his workload was reduced, Adair would be offered additional work, and if such work was not amenable to him, he could elect to receive the lesser of either his fee prorated for six months or the amount remaining on his contract. Exhibits P–T. From this evidence, it appears the parties had reached a specific agreement as to several material terms of the relationship.

Two terms, however, are modified in the exchange of drafts. Although all the drafts contemplate a work week that is less than five days, the drafts vary as to whether Adair would be present at the Groton campus for the work week, or if he had greater flexibility in his schedule. Some drafts state that Adair was expected to be in Groton four days a week, while others omit that requirement. *Compare* Exhibits O and T *with* Exhibits P–R. Some versions of the agreement provided that Adair would work as much as was necessary to execute the goal of developing and implementing a leadership development and succession planning program. Exhibit O. Conversely, other drafts stated that Adair would not work in excess of 192 days per year. Exhibits Q and R.

Pfizer claims that Adair's work week is a material term of the prospective employment contract and, because no agreement was reached on that term, no contract was formed between the parties. To support this proposition, Pfizer cites *Conner v. Lavaca,* 267 F.3d 426 (5th Cir.2001). In *Conner,* the Fifth Circuit found no contract where the parties had not agreed on the employee's work schedule. The *Conner* court explained, "the determination of whether a term is essential must be done

with respect to the contract and the particular circumstances in each case." *Id.* at 432. In that case, the parties agreed to a reduced work week, but not how to administer the reduced schedule.

▮ Under Connecticut law, however, material terms "essential to an employment contract" include terms regarding the duration and conditions of the plaintiff's employment, and salary and fringe benefits. *D'Ulisse–Cupo v. Bd. of Directors of Notre Dame,* 202 Conn. 206, 215, 520 A.2d 217 (1987). Although the parties had not resolved the particulars of Adair's work week, throughout the exchange of drafts it is clear that the parties contemplated that Adair's work week would be limited to four days.

Pfizer also contends that there was no agreement concerning Adair's job responsibilities. Although the description of Adair's responsibilities remained consistent throughout the exchange of drafts, the last two versions of the contract described the job description in different terms. Until mid-January 1999, Adair's duties were "to work with the Central Research organization... to *create* an effective, Pfizer exclusive, leadership development succession planning process and program." Exhibits O–R (emphasis added). In the last two drafts of the agreement, exchanged after Adair started work at Pfizer's Groton campus, his duties were to "work with the Central Research organization... to *help establish* a process for and *facilitate in the creation* of an effective, Pfizer exclusive, leadership development succession planning process and program." Exhibits S and T (emphasis added). Similarly, earlier drafts stated that "Consultant will use his best efforts in leading this project and performing those services needed to effectively achieve the Program goals." Exhibits O–R. While later drafts specified that "Consultant will use his best

efforts in leading this project and performing those services needed to effectively achieve the Program goals for which the Consultant has been engaged to *help effect.*" Exhibits S and T (emphasis added).

Adair argues that the job description issued prior to January 19, 1999, was an agreed-upon term. Thus, the subsequent changes in the job responsibilities, coupled with Nelson's statements at the Scottsdale conference, signaled a significant alteration to the proposed job duties that effectively terminated the position as originally contemplated.

Because the phrasing of Adair's job description was consistent from the beginning of negotiations until the point when he began work at Pfizer, a reasonable jury could find that the requirements of the position were sufficiently certain at the time Adair started work. Thus, a jury could find that a contract was formed when, after Pfizer had signed the parties' agreement, Adair presented himself for work and Pfizer began accepting his consulting services.

Based on the evidence presented, a reasonable fact finder, viewing the evidence in a light most favorable to Adair, could find that the parties had a meeting of the minds on the essential terms of their arrangement. A reasonable fact finder could determine that the parties had agreed upon a four-day work week, compensation, and job responsibilities.

*Breach of Contract*

 Adair seeks damages under the total termination clause included in all the contract drafts. Although the language of the clause was altered as successive drafts

were exchanged, each version of the agreement included the following provision:

> Pfizer shall have the right to terminate this Agreement or to cancel any of the work to be performed hereunder after giving Consultant thirty (30) days prior written notice of its intent [to terminate the agreement without cause]. . . . In the event of total agreement termination without cause, Pfizer agrees to pay Consultant, as damages, an amount equal to, but not to exceed, the base annual fee to which the Consultant is entitled as of the date of such termination, except that Consultant may not receive monies in excess of the months remaining on the term of the agreement or any written extension thereof.

Exhibits P, Q, R, T.[2]

 A party totally terminates an agreement when it ceases to perform its obligations under the agreement. In order for Adair to prevail under the termination clause, he would have to provide evidence from which a reasonable jury could find that Pfizer ceased to perform its obligations under the contract. Assuming *arguendo* that there was an enforceable contract, Adair has presented no evidence from which a reasonable finder of fact could conclude that Pfizer totally terminated the agreement. Testimony from multiple witnesses, including Adair, confirms that, when Adair expressed misgivings about his job status to Pfizer representatives, they provided adequate assurances that his job remained intact and encouraged him to remain at Pfizer. McCool Dep. at 148–51, 158–59; Nelson Dep. at 41–42, 44–48; Adair Dep. at 166–67, 174–76; Gross Dep. at 42–46.

---

**2.** Although the language of this provision varies by draft, its substance remains intact. Exhibit S states, "Pfizer agrees to pay Consultant $160,000 or at the rate of $13,333.33 per month until January 4, 2002. Whichever is less." Prior and subsequent drafts provide termination damages in the amount of the base annual fee, not to exceed twelve months.

Adair concedes that Pfizer did not expressly terminate his employment. Instead, he argues that Pfizer effectively terminated the agreement by drastically altering the nature of his job responsibilities. The record does not permit such a finding. At best, the record indicates that Pfizer modified the job description's language in a way that caused Adair to believe his job responsibilities were in jeopardy. There is no evidence to suggest that Pfizer contemplated a wholesale reassessment of Adair's role, or the elimination of his position entirely. Despite assurances from Pfizer representatives that his job remained unchanged, Adair voluntarily left the position. Pfizer was then forced to undertake a search for a new candidate to fulfill Adair's role.

■■■■ Adair's total termination claim is analogous to a constructive discharge claim. "Through the use of constructive discharge, the law recognizes that an employee's 'voluntary' resignation may be, in reality, a dismissal by an employer." *Seery v. Yale–New Haven Hospital,* 17 Conn.App. 532, 540, 554 A.2d 757 (1989) (internal citations and quotations omitted). Under Connecticut law, "[c]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir.1996) (emphasis in original); *accord Seery,* 17 Conn.App. at 540, 554 A.2d 757. A working environment is considered intolerable if it is "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chertkova,* 92 F.3d at 89. Accordingly, "[a] claim of constructive discharge must be supported by more than the employee's subjective opinion that the job conditions have become so intolerable

that he or she was forced to resign." *Brittell v. Dep't. of Correction,* 247 Conn. 148, 178, 717 A.2d 1254 (Conn.1998) (internal citations and quotation marks omitted).

Adair has presented no evidence to suggest that any changes in his job description or the nature of his consulting activities was so intolerable that he was forced to resign. Indeed, Adair's abrupt resignation in the face of Pfizer's repeated entreaties to stay suggests that he did not remain at the Groton campus long enough even to find out what his "substitute new work" would be, much less to suffer sufficiently intolerable conditions to permit a finding of constructive discharge. Exhibit R.

Because there are no facts to support a finding that Pfizer totally terminated the agreement, either expressly or constructively, Adair's claim for recovery under the termination clause must fail.

*Promissory Estoppel*

■■■ Adair's claims premised on a theory of promissory estoppel rest on the assertion that Pfizer eliminated his position and failed to provide him with comparable work or to pay the full termination fee. To recover on a theory of promissory estoppel, a plaintiff must plead and prove four elements: 1) the promisor made a clear and definite promise; 2) the promisee reasonably relied on the promise; 3) the promise induced the action taken by the promisee; and 4) injustice can be avoided only by enforcement of the promise. *Tabora v. Amdour, Inc.,* 2002 WL 652815, 2002 Conn.Super. LEXIS 939, *7 (Conn.Super.2002).

■■■ Pfizer promised that Adair would be given primary responsibility for the leadership development and succession planning project, *or* would be given comparable work to perform. Pfizer did not, as Adair alleges in paragraph 30 of his com-

plaint, "fail[ ] to offer him comparable work." Compl. at ¶ 30. Indeed, by abruptly resigning his position, even after Pfizer assured him that his services were still needed, Adair precluded Pfizer from fulfilling the terms of the agreement/promise.

Accordingly, Adair's promissory estoppel claim fail for much the same reason as does his contract claim.

*Negligent Misrepresentation*

 Adair also claims that Pfizer is liable for negligent misrepresentation because its employees promised him that he would be given leadership responsibility for the project or comparable work for a three-year period, or that he would be compensated in accordance with the termination clause if his consulting services became unnecessary. Under Connecticut law, "[o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Craine v. Trinity College,* 259 Conn. 625, 661, 791 A.2d 518 (2002) (citations omitted and internal quotations omitted.). "Even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *Id.*

Adair claims that Pfizer is liable for McCool's representation that Nelson's appointment to Vice President for Employee Resources would not affect Adair's position. At the end of his interview process with Pfizer, Adair met with Nelson and was informed that Nelson would be taking over from Zeigler. Concerned this change

might impact the consultant position, Adair asked McCool about the implications of Nelson's appointment. McCool responded that Adair's role would remain unchanged once Nelson became Vice President for Employee Resources. McCool Depo. at 75–76, 78–79, 81.

Again, Adair's decision to resign his position is dispositive of the claim of negligent misrepresentation. McCool's statement was a prediction of future events. Because Adair resigned his position before the impact of Nelson's appointment could be assessed, and, indeed, before Pfizer could take steps, if necessary, to offer Adair comparable alternative work, there is no evidence that Nelson's appointment actually resulted in a reduction of Adair's role on the project. Consequently, a reasonable jury could not find that Pfizer representatives made misrepresentations to Adair by stating that Nelson's appointment would not affect the consultant position.

 Adair also seeks to hold Pfizer vicariously liable for negligent misrepresentation on the basis of statements made by Zeigler. The record indicates that Zeigler did not believe Nelson's appointment would change Adair's position. Zeigler Depo at 36, 41. Consequently, Zeigler never warned Adair about problems that, Adair argues, Zeigler should have foreseen. Nothing in the record indicates that Adair specifically asked Zeigler about the consequences of Nelson's appointment. To hold Pfizer liable for Zeigler's omissions, Adair must establish that Zeigler owed Adair an affirmative duty to warn him of impending changes in the consultant position. There is no evidence supporting such an obligation. Accordingly, no claim of negligent misrepresentation can be based on Zeigler's conduct.[3]

---

**3.** Adair also bases his claim of negligent mis-

representation on Pfizer's representation that

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [doc. # 32] is GRANTED on all counts. The clerk shall enter judgment for the defendant and close the file.

It is so ordered.

Adair would receive up to twelve months' pay if the agreement was terminated without cause. Because there is no evidence from which a jury could find that the agreement was terminated, this theory of liability fails.